PD-0667-15
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 7/13/2015 3:22:43 PM
Accepted 7/15/2015 3:36:03 PM
ABEL ACOSTA
CLERK

**PD 0667-15**

## In the Court of Criminal Appeals

### of Texas

_____

**KENNETH COOPER McAFEE,**
*Appellant,*

**v.**

**THE STATE OF TEXAS,**
*Appellee.*

_____

On Petition for Discretionary Review from the
First Court of Appeals in No. 01-13-00777-CR
affirming the conviction in cause number 1262341,
From the 339th District Court of Harris County, Texas

_____

APPELLANT'S PETITION FOR DISCRETIONARY REVIEW

_____

ORAL ARGUMENT NOT REQUESTED

**ALEXANDER BUNIN**
Chief Public Defender
Harris County, Texas

**JANI MASELLI WOOD**
Assistant Public Defender
Harris County, Texas
TBN. 00791195
1201 Franklin Street, 13th Floor
Houston, Texas 77002
Phone: (713) 368-0016
Fax: (713) 368-9278

Counsel for Appellant
July 13, 2015

FILED IN
COURT OF CRIMINAL APPEALS

July 15, 2015

ABEL ACOSTA, CLERK

## IDENTITY OF PARTIES AND COUNSEL

APPELLANT:                        Mr. Kenneth Cooper McAfee
TDCJ# 01879352
Polunsky Unit
3872 FM 350 South
Livingston, TX 77351

TRIAL PROSECUTOR:         Ms. Donna Logan
APPELLATE PROSECUTOR:   Ms. Jessica Caird
Assistant District Attorney
Harris County, Texas
1201 Franklin, 6th Floor
Houston, Texas 77002

DEFENSE COUNSEL AT TRIAL:  Mr. Gerald Fry
Ms. Emily Shelton
801 Congress #350
Houston, Texas 77002

PRESIDING JUDGE:          Hon. Maria T. Jackson, Presiding Judge
339th District Court
Harris County, Texas
1201 Franklin, 14th floor
Houston, Texas 77002

DEFENSE COUNSEL ON APPEAL: Mrs. Jani Maselli Wood
Assistant Public Defender
Harris County, Texas
1201 Franklin, 13th Floor
Houston, Texas 77002

# TABLE OF CONTENTS

**PAGE**

Identity of Parties. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

Table of Contents. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

Index of Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

Statement Regarding Oral Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

Statement of the Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

Statement of Procedural History. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

Ground for Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

> The attorney/client privilege is viewed from the perspective of the
> client.  The State never provided any evidence Mr. McAfee had waived
> the privilege.  Did the Court of Appeals err in determining that the trial
> court did not abuse its discretion is admitting evidence protected by
> attorney/client privilege?. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Reason for Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

Statement of Facts.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

Argument.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

> 1. Neither the State nor the Court of Appeals could ever point to
>    evidence Mr. McAfee had waived his attorney/client privileged
>    discussions with Mr. Storer.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

> 2. The privilege belonged to Mr. McAfee to waive - not his attorney
>    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

3.      The Court of Appeals belief that because Mr. McAfee and his attorney were friends that no privilege existed is inconsequential to whether the privilege was actually waived.. . . . . . . . . . . . . . . . . . 11

Prayer for Relief. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Certificate of Service. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Certificate of Compliance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Appendix . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

INDEX OF AUTHORITIES

PAGE

**Cases**:

*Carmona v. State*,
    941 S.W.2d 949 (Tex. Crim. App. 1997). . . . . . . . . . . . . . . . . . . . . . . 9, 10, 11

*Cruz v. State*,
    586 S.W.2d 861 (Tex. Crim. App. [Panel Op.] 1979).. . . . . . . . . . . . . . 11, 12

*McAfee v. State*,
    01-13-00777-CR, 2015 WL 2235122
    (Tex. App.—Houston [1st Dist.] May 12, 2015, no. pet. h.) . . . . . . . . passim

*Motilla v. State*,
    78 S.W.3d 352 (Tex. Crim. App. 2002) . . . . . . . . . . . . . . . . . . . . . . . 10

*Sanford v. State*,
    21 S.W.3d 337 (Tex. App. - El Paso 2000, no pet.). . . . . . . . . . . . . . . . 10

*State v. Martinez*,
    116 S.W.3d 385 (Tex. App. - El Paso 2003, no pet.). . . . . . . . . . . . . . . 10

**Statutes and Rules**:

TEX. CODE CRIM. PROC. 19.02. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

TEX. R. EVID. 503 (b)(1)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

TEX. R. EVID. 503(B)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

TEX. R. EVID. 503 (b)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

STATEMENT REGARDING ORAL ARGUMENT

Oral argument is not requested.

STATEMENT OF THE CASE

This is an appeal from a conviction for murder. (I. C.R. at 687). TEX. CODE CRIM. PROC. 19.02. Mr. McAfee pleaded not guilty by reason of insanity and was found guilty by a jury. (I. R.R. at 415, 687). The judge assessed punishment at confinement for 99 years in the Texas Department of Criminal Justice - Institutional Division and a $10,000 fine. (C.R. at 687).

STATEMENT OF THE PROCEDURAL HISTORY

In a published opinion, the First Court of Appeals affirmed Mr. MCafee's conviction. *McAfee v. State*, 01-13-00777-CR, 2015 WL 2235122 (Tex. App.—Houston [1st Dist.] May 12, 2015, no. pet. h.). No motion for rehearing was filed. After an extension of time, this petition is timely if filed on or before July 13, 2015.

GROUND FOR REVIEW

The attorney/client privilege is viewed from the perspective of the client. The State never provided any evidence Mr. McAfee had waived the privilege. Did the Court of Appeals err in determining that the trial court did not abuse its discretion is admitting evidence protected by attorney/client privilege?

REASON FOR REVIEW

The First Court of Appeals has decided an important question of state or federal law in a way that conflicts with the applicable decisions of the Court of Criminal Appeals or the Supreme Court of the United States. TEX. R. APP. P. 66.3(c).

STATEMENT OF FACTS RELATIVE TO GROUND RAISED

Mr. McAfee was convicted of killing his wife; the Court of Appeals explained his background succinctly:

In 2006, appellant began to suffer from various health problems. These issues led to the breakup of appellant's marriage to Janet, and the two were in the process of getting divorced. The record contains conflicting evidence regarding the nature of appellant's physical and mental health issues and includes testimony that appellant suffered from drug and alcohol abuse, depression, anxiety and panic attacks, degenerative neurological disease, and dementia. It is undisputed that at the time of the offense appellant was living in an assisted living facility.

*McAfee*, 2015 WL 2235122, at *1. Mr. McAfee shot his wife and due to a panic alarm, there was a SWAT stand off. *Id.*, at *1-3.

-7-

*Motion to Suppress*

The defense moved to suppress the statements of Charles Storer, Mr. McAfee's attorney. (6 R.R. at 8). A hearing was held outside the presence of the jury. (6 R.R. at 8). Mr. Storer stated Mr. McAfee called him on the day of the offense and stated he had done something horrible. (6 R.R. at 9). Mr. Storer testified it was a private conversation and that Mr. McAfee was talking to him in his capacity as an attorney. (6 R.R. at 9). Mr. Storer went to the scene of the offense and introduced himself to the police as Mr. McAfee's attorney. (6 R.R. at 9). Defense Exhibit 1 was introduced, a police report stating that Mr. Storer arrived on the scene and introduced himself as the attorney of Mr. McAfee. (21 R.R. at D-1; 6 R.R. at 10).

The State focused on the fact that Mr. McAfee and Mr. Storer had been friends for many years. (6 R.R. at 7-14). Mr. McAfee had lived with Mr. Storer and his wife for a short time. (6 R.R. at 18-21). In the beginning of May 2012, Mr. Storer had started representing Mr. McAfee in his divorce. (6 R.R. at 16). The State asked whether there had been any formal discussions about representing him in criminal matters. (6 R.R. at 17). Further, the State offered the 9-1-1 call where Mr. Storer called the police telling them there had been a shooting, and that his friend had killed his wife. (6 R.R. at 21). Mr. Storer also gave information to the police about what Mr. McAfee had told him. (6 R.R. at 23). In that statement, Mr. Storer agreed with the

-8-

officer that he was not representing Mr. McAfee on a criminal case. (6 R.R. at 27).

However, Mr. Storer clarified that he was trying to find another attorney to handle the

criminal case and he was representing him. (6 R.R. at 29-30). Further, Mr. McAfee

never waived the attorney/client privilege nor gave Mr. Storer permission to speak

with anyone about the case. (6 R.R. at 30).

After argument of counsel, the court determined there was no attorney/client

privilege. (6 R.R. at 39).

### Argument

The attorney/client privilege is viewed from the perspective of the client. The State never provided any evidence Mr. McAfee had waived the privilege. Did the Court of Appeals err in determining that the trial court did not abuse its discretion is admitting evidence protected by attorney/client privilege?

1. **Neither the State nor the Court of Appeals could ever point to evidence Mr. McAfee had waived his attorney/client privileged discussions with Mr. Storer.**

The Court of Appeals held "[t]he record contains conflicting evidence

regarding the nature of appellant's relationship with Storer at the time the phone calls

occurred." *McAfee*, 2015 WL 2235122 at *16. Then the Court of Appeals stated that

"appellant told police that he wanted to see his attorney and that when Storer arrived

on the scene, he introduced himself as appellant's attorney." *Id.*

**2.    The privilege belonged to Mr. McAfee to waive - not his attorney.**

A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client; between the client or a representative of the client, and the client's lawyer or a representative of the lawyer. TEX. R. EVID. 503 (b)(1)(A). In criminal cases, a client has a privilege to prevent the lawyer or lawyer's representative from disclosing any other fact which came to the knowledge of the lawyer or the lawyer's representative by reason of the attorney-client relationship. TEX. R. EVID. 503 (b)(2).

The power to waive the attorney-client privilege belongs to the client, or his attorney or agent both acting with the client's authority. *Carmona v. State*, 941 S.W.2d 949, 953 (Tex. Crim. App. 1997).  This Court has explained:

> the mere fact privileged materials already have been disclosed does not establish a "presumptive" or "automatic waiver." *See Jordan v. Court of Appeals for Fourth Supreme Judicial District*, 701 S.W.2d 644, 649–51 (Tex.1985) (orig. proceeding) (Gonzalez, J., concurring and dissenting) (mere disclosure of privileged materials does not establish an "automatic waiver"); TEX.R.CRIM.EVID. 511 (holder of the privilege waives the privilege if he discloses or consents to disclosure of any significant part of privileged materials).

*Carmona v. State*, 941 S.W.2d 949, 953-54 (Tex. Crim. App. 1997).

A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the

-10-

rendition of professional legal services to the client. TEX. R. EVID. 503(B)(1). 503(B)(2) further provides that:

> in criminal cases, a client has a privilege to prevent the lawyer or lawyer's representative from disclosing any other fact which came to the knowledge of the lawyer or the lawyer's representative by reason of the attorney-client relationship.

The "[i]nvocation of the privilege is dependent upon the existence of an attorney-client relationship, which has been defined as a contractual relationship whereby an attorney agrees to render professional services for a client." *State v. Martinez*, 116 S.W.3d 385, 392 (Tex. App. - El Paso 2003, no pet.). The client bears the burden of establishing the existence of the privilege. *Sanford v. State*, 21 S.W.3d 337, 342 (Tex. App. - El Paso 2000, no pet.), abrogated on other grounds, *Motilla v. State*, 78 S.W.3d 352 (Tex. Crim. App. 2002). Mr. Storer had been representing Mr. McAfee in his divorce. (6 R.R. at 15-16). There was an attorney/client relationship.

The "attorney-client privilege is designed for the benefit of the client by guaranteeing to the client the confidentiality necessary to promote forthright communications between the lawyer and the client." *Carmona*, 941 S.W.2d at 953. Additionally "[t]he Rules of Criminal Evidence make it clear the attorney-client privilege is held by the client, not the attorney... [a]nd only the client, or an attorney acting with the client's consent, may waive the attorney-client privilege." *Carmona*, 941 S.W.2d at 956. (Baird concurring) (citations omitted). Texas law does not authorize

attorneys to unilaterally waive the attorney-client privilege for their clients; only the client may relinquish the privilege. *Id. citing Cruz v. State*, 586 S.W.2d 861 (Tex. Crim. App. [Panel Op.] 1979).

**3.** **The Court of Appeals belief that because Mr. McAfee and his attorney were friends that no privilege existed is inconsequential to whether the privilege was actually waived.**

The Court of Appeals discussion of the friendship of the two men is insignificant for the analysis:

> However, it was undisputed that appellant and Storer were long-time friends, and Storer testified that he was probably appellant's closest friend. Appellant did not call Storer's legal office; rather, he called Storer's cell phone. Storer also acknowledged that he did not typically practice criminal defense law.

*McAfee*, 2015 WL 2235122, at *16.

Mr. McAfee referred to Charles Storer as "my attorney" while talking to the S.W.A.T negotiator and received legal advice from Charles Storer on May 8, 2010. Charles Storer testified that he was giving legal advice *and* viewed Mr. McAfee as his friend as well. An objective analysis of these facts demonstrate Mr. McAfee thought he was conducting privileged communications to obtain legal advice from an attorney.

However it is not Mr. McAfee's burden to disprove waiver, it is the State's burden to prove waiver. *Carmona*, 941 S.W.2d at 953(party seeking to benefit from a finding of waiver has the burden to provide evidence that supports a finding of

-12-

waiver). The State failed to do so. Waiver is not to be "lightly inferred." *Cruz*, 586 S.W.2d at 865.

Mr. McAfee was harmed because the statements by Storer were used by Dr. Moeller to somehow prove that Mr. McAfee was sane at the time of the offense. The jury could have latched onto this privileged communications and used to justify their decision to not find for the insanity defense. The law is clear - there was not one shred of evidence presented that Mr. McAfee ever waived the privilege with Mr. Storer. A review of the SWAT recording (SX 96) shows Mr. McAfee repeatedly asked for his attorney. Mr. Storer introduced himself as Mr. McAfee's attorney.

The Court of Appeals erred in determining that the trial court did not err in failing to grant the motion to suppress. Review should be granted.

PRAYER FOR RELIEF

For the reasons states above, Mr. McAfee prays that this Court grant his petition for discretionary review.

Respectfully submitted,
**ALEXANDER BUNIN**
Chief Public Defender
Harris County Texas

*Jani Maselli Wood*

_____
JANI J. MASELLI WOOD
Assistant Public Defender
Harris County, Texas
Jani.Maselli@pdo.hctx.net
TBN. 00791195
1201 Franklin Street, 13th Floor
Houston, Texas 77002
Phone: (713) 368-0016
Fax: (713) 368-9278

Attorney for Appellant
Kenneth Cooper McAfee

CERTIFICATE OF SERVICE

Pursuant to Tex. R. App. Proc. 9.5, this certifies that on July 13, 2015, a copy of the foregoing was emailed to Lisa McMinn, State Prosecuting Attorney, and the Harris County District Attorney's Office through texfile.com at the following address:

Jessica Caird
Assistant District Attorney
1201 Franklin Street, 6th Floor
Houston, TX 77002
caird_jessica@dao.hctx.net

Lisa McMinn
Lisa.McMinn@SPA.texas.gov

*Jani Maselli Wood*

_____

JANI J. MASELLI WOOD

CERTIFICATE OF COMPLIANCE

Pursuant to proposed Rule 9.4(i)(3), undersigned counsel certifies that this petition complies with the type-volume limitations of TEX. R. APP. PROC. 9.4(I)(2)(D).

1.     Exclusive of the portions exempted by TEX. R. APP. PROC. 9.4 (I)(1), this petition contains 1768 words printed in a proportionally spaced typeface.

2.     This petition is printed in a proportionally spaced, serif typeface using Garamond 14 point font in text and Garamond 14 point font in footnotes produced by Corel WordPerfect software.

3.     Undersigned counsel understands that a material misrepresentation in completing this certificate, or circumvention of the type-volume limits in *Tex. R. App. Proc. 9.4(j)*, may result in the Court's striking this brief and imposing sanctions against the person who signed it.

*Jani Maselli Wood*

_____

JANI J. MASELLI WOOD

**Appendix A**


Opinion *London v. State*

2015 WL 2235122

Only the Westlaw citation is currently available.

NOTICE: THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION IN THE PERMANENT LAW REPORTS. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

Court of Appeals of Texas,

Houston (1st Dist.

Kenneth Cooper McAfee, Appellant

v.

The State of Texas, Appellee

NO. 01–13–00777–CR | Opinion issued May 12, 2015

Synopsis

Background: Defendant was convicted in the 339th District Court, Harris County, of murder and he was sentenced to 99 years of imprisonment. Defendant appealed.

Holdings: The Court of Appeals, Evelyn V. Keyes, J., held that:

[1] evidence was factually sufficiency to support finding that defendant was aware his conduct was wrong when he murdered his wife;

[2] the trial court's error, if any, in permitting the prosecution to define the word "wrong" during voir dire by using a commonly accepted definition of the term that was broader than the definition set out by caselaw did not constitute reversible error; and

[3] the attorney-client privilege did not apply to bar evidence of the telephone calls defendant made to his friend, who was also an attorney, on the night of the murder.

Affirmed.

West Headnotes (43)

[1]  Criminal Law
    ☞ Defenses in general
    Criminal Law
    ☞ Particular issues or elements

The Texas Court of Criminal Appeals has adopted the civil standard of factual-sufficiency review for challenges to the rejection of an affirmative defense because the burden of proof is that of preponderance of the evidence, the same burden applied in civil proceedings.

Cases that cite this headnote

[2]  Criminal Law
    ☞ Particular issues or elements

In making a factual-sufficiency claim, the defendant is asserting that, considering the entire body of evidence, the jury's adverse finding on his affirmative defense was so against the great weight and preponderance of the evidence as to be manifestly unjust.

Cases that cite this headnote

[3]  Criminal Law
    ☞ Weight of Evidence in General
    Criminal Law
    ☞ Province of jury or trial court

On a challenge to the sufficiency of the evidence the Court of Appeals may not usurp the function of the jury by substituting its judgment in place of the jury's assessment of the weight and credibility of the witnesses' testimony.

Cases that cite this headnote

[4]  Criminal Law
    ☞ Verdict unsupported by evidence or contrary to evidence
    Criminal Law
    ☞ Rendition, form, and entry of judgment

The Court of Appeals may sustain a defendant's factual-sufficiency claim only if, after setting out the relevant evidence and explaining precisely how the contrary evidence greatly outweighs the evidence supporting the verdict, the Court clearly states why the verdict is so much against the great weight of the evidence as to be manifestly unjust, conscience-shocking, or clearly biased.

Cases that cite this headnote

[5]  Criminal Law
    ☞ Particular issues or elements
    Criminal Law
    ☞ Ordering new trial

If the Court of Appeals determines that the evidence supporting an affirmative defense so greatly outweighs the State's contrary evidence that the verdict is manifestly unjust, then the Court of Appeals may reverse the trial court's judgment and remand for a new trial.

Cases that cite this headnote

[6]  Criminal Law
    ☞ Insanity

To establish the affirmative defense of insanity, the defendant must prove that, at the time of the conduct charged, the actor, as a result of severe mental disease or defect, did not know that his conduct was wrong. Tex. Penal Code Ann. § 8.01.

Cases that cite this headnote

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.

[7]  Criminal Law
 🔑  Innocence
Criminal Law
 🔑  Degree of proof

The law presumes that the accused is sane, and the accused bears the burden of proving by a preponderance of the evidence that he is insane. Tex. Penal Code Ann. § 8.01.

Cases that cite this headnote

[8]  Criminal Law
 🔑  Insanity

The insanity defense focuses on whether the accused understood the nature of his action and whether he knew he should not do it. Tex. Penal Code Ann. § 8.01.

Cases that cite this headnote

[9]  Criminal Law
 🔑  Insanity

For the purpose of an insanity defense, if the accused knows that his conduct is illegal by societal standards, then he understands that his conduct is wrong, even if, due to a mental disease or defect, he thinks his conduct is morally justified. Tex. Penal Code Ann. § 8.01.

Cases that cite this headnote

[10]  Criminal Law
 🔑  Insanity

Proof of a mental disease or defect alone is not sufficient to establish an affirmative defense of insanity. Tex. Penal Code Ann. § 8.01.

Cases that cite this headnote

[11]  Criminal Law
 🔑  Experts
Criminal Law
 🔑  Insanity or Other Incapacity

Although jurors may not arbitrarily disregard expert testimony as to insanity, neither may they give conclusive effect to such testimony.

Cases that cite this headnote

[12]  Criminal Law
 🔑  Defense of insanity

Whether the defense of insanity was proved is a decision that lies within the province of the jury, both as to the credibility of witnesses and the weight of the evidence and as to the limits of the defense.

Cases that cite this headnote

[13]  Homicide
 🔑  Insanity

Evidence was factually sufficiency to support finding that defendant was aware his conduct was wrong when he murdered his wife, in support of the jury's rejection of defendant's insanity defense, during prosecution for murder, even though several experts believed defendant's disorders were attributable to a degenerative neurological disorder, the State's expert witness opined that defendant was not suffering from a degenerative neurological disorder and that he was sane at the time he committed the offense, defendant had a history of drug and alcohol abuse that could have contributed to his mental disorders, several witnesses testified that defendant was placed in an assisted living facility due to his drug issues and not due to his dementia, defendant's treating psychiatrist, testified that he treated defendant up until the month preceding the offense and he had never had any reason to believe that appellant suffered from psychosis, delusions, hallucinations, dementia, or any degenerative neurological disorder or other physiological reason for his mental disorders, and there was no medical evidence indicating that defendant suffered from anything other than severe major depressive disorder and anxiety until after he committed the murder, shot himself in the face, and was incarcerated. Tex. Penal Code Ann. § 8.01.

Cases that cite this headnote

[14] Jury
 Discretion of court

The trial court has broad discretion over the process of selecting a jury.

Cases that cite this headnote

[15] Criminal Law
 Selection and impaneling

The Court of Appeals will not disturb the trial court's ruling on the propriety of a particular voir dire question absent an abuse of discretion.

Cases that cite this headnote

[16] Jury
 Examination of Juror

A voir dire question is proper if it seeks to discover a juror's views on an issue applicable to the case.

Cases that cite this headnote

[17] Jury
 Examination of Juror

Voir dire questions that misstate the law are improper.

Cases that cite this headnote

[18] Criminal Law
 Arguments and Statements by Counsel

Generally, a prosecutor's statements during voir dire will not constitute error unless they are contrary to the trial court's charge.

Cases that cite this headnote

[19] Criminal Law
 Custody and conduct of jury

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.

When a term is undefined in the charge, the Court of Appeals presumes that the jury attaches a common understanding to the meaning of the term.

Cases that cite this headnote

[20] Criminal Law
 Impaneling jury in general

A trial court's erroneous ruling on issues relating to questioning a venire panel about its understanding of the burden of proof is non-constitutional error subject to a harm analysis. Tex. R. App. P. 44.2(b).

Cases that cite this headnote

[21] Criminal Law
 Impaneling jury in general

The trial court's error, if any, in permitting the prosecution to define the word "wrong" during voir dire by using a commonly accepted definition of the term that was broader than the definition set out by caselaw did not constitute reversible error, during murder prosecution; the error did not have a substantial or injurious effect or influence the verdict against defendant.

Cases that cite this headnote

[22] Criminal Law
 Reception of evidence

In reviewing a trial court's ruling on a motion to suppress, appellate courts must view the evidence in the light most favorable to the trial court's ruling.

Cases that cite this headnote

[23] Criminal Law
 Reception of evidence
Criminal Law
 Evidence wrongfully obtained

When a trial court makes explicit fact findings when ruling on a motion to suppress, the Court of Appeals must determine whether the evidence viewed in the light most favorable to the trial court's ruling supports the fact findings.

Cases that cite this headnote

[24] Criminal Law
 Review De Novo
Criminal Law
 Evidence wrongfully obtained

The Court of Appeals reviews motions to suppress pursuant to a bifurcated standard under which the trial court's determinations of historical facts and mixed questions of law and fact that rely on credibility are granted almost total deference when supported by the record; however, for questions of law or mixed questions of law and fact that do not depend on the evaluation of credibility and demeanor, the Court reviews the trial court's ruling de novo.

Cases that cite this headnote

[25] Criminal Law
 Trial judge as sole arbiter of credibility

At a suppression hearing, the trial court is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony.

Cases that cite this headnote

[26] Criminal Law
 Credibility of witnesses in general

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.

The trial court may choose to believe or disbelieve any part or all of a witness's testimony.

Cases that cite this headnote

[27] Criminal Law
 Illegally obtained evidence
Criminal Law
 Evidence wrongfully obtained

The Court of Appeals sustains the trial court's ruling on a motion to suppress if it is reasonably supported by the record and correct on any theory of law applicable to the case.

Cases that cite this headnote

[28] Privileged Communications and Confidentiality
 Elements in general; definition

The scope of the attorney-client privilege as set out in the rules of evidence is limited to communications made by a client seeking legal advice from a lawyer in her capacity as such and the communication must relate to the purpose for which the advice is sought. Tex. R. Evid. 503(b)(1).

Cases that cite this headnote

[29] Privileged Communications and Confidentiality
 Definition of 'privilege'

In general, privileges are exclusionary rules of evidence that may be used to suppress relevant evidence.

Cases that cite this headnote

[30] Privileged Communications and Confidentiality
 Waiver of privilege

The client can waive the attorney-client privilege by voluntarily disclosing or consenting to the disclosure of a significant part of the privileged matter. Tex. R. Evid. 503(a), 511(1).

Cases that cite this headnote

[31] Privileged Communications and Confidentiality
 Presumptions and burden of proof

A party asserting a privilege has the burden of showing that the privilege applies.

Cases that cite this headnote

[32] Privileged Communications and Confidentiality
 Presumptions and burden of proof

Once the privilege has been established, the party seeking to establish waiver of the privilege has the burden of going forward with evidence that supports a finding of waiver.

Cases that cite this headnote

[33] Privileged Communications and Confidentiality
 Waiver of privilege

Waiver of a privilege may be inferred from the totality of the circumstances and reasonable inferences.

Cases that cite this headnote

[34] Privileged Communications and Confidentiality
 Waiver of privilege

The disclosure of the privileged material by defense counsel is relevant in determining waiver of the attorney-client privilege. Tex. R. Evid. 503.

Cases that cite this headnote

[35] Privileged Communications and Confidentiality
🔑 Presumptions and burden of proof

After the State has gone forward with evidence supporting waiver of the attorney-client privilege, the party claiming the privilege may find it wise to present evidence of no waiver. Tex. R. Evid. 503.

Cases that cite this headnote

[36] Criminal Law
🔑 Privilege

The Court of Appeals reviews the trial court's decision on the applicability of a privilege for an abuse of discretion.

Cases that cite this headnote

[37] Criminal Law
🔑 Witnesses
Criminal Law
🔑 Reception of evidence

The Court of Appeals can reverse a decision concerning waiver of the attorney-client privilege only if the trial court applied an erroneous legal standard, or when no reasonable view of the record could support the trial court's conclusion under the correct law and the facts viewed in the light most favorable to its legal conclusion. Tex. R. Evid. 503.

Cases that cite this headnote

[38] Privileged Communications and Confidentiality
🔑 Relation of Attorney and Client
Privileged Communications and Confidentiality
🔑 Particular cases

The attorney-client privilege did not apply to bar evidence of the telephone calls defendant made to his friend, who was also an attorney, on the night of the murder, during murder prosecution; defendant and attorney were long-time friends, defendant called attorney's cellular telephone, not his legal office, attorney generally did not practice criminal law, attorney had never previously represented defendant in a criminal matter, and the communications were not made to facilitate legal services. Tex.R. Evid. 503(a)(5), (b)(1).

Cases that cite this headnote

[39] Constitutional Law
🔑 Presumptions and Construction as to Constitutionality
Constitutional Law
🔑 Intent of and Considerations Influencing Legislature

In addressing a constitutional challenge, the Court of Appeals must begin with the presumption that the statute is valid and that the Legislature did not act arbitrarily or unreasonably in enacting it.

Cases that cite this headnote

[40] Constitutional Law
🔑 Burden of Proof

The party challenging the statute has the burden to establish its unconstitutionality.

Cases that cite this headnote

[41] Constitutional Law
🔑 Facial invalidity

To prevail on a facial challenge, a party must establish that the statute always operates unconstitutionally in all possible circumstances.

Cases that cite this headnote

[42] Constitutional Law
👉 Encroachment in general

The Texas Constitution's separation of powers provision ensures that power granted one branch may be exercised by only that branch, to the exclusion of others, and therefore requires that any attempt by one department of government to interfere with the powers of another is null and void. Tex. Const. art. 2, § 1.

Cases that cite this headnote

[43] Constitutional Law
👉 Sentencing and punishment
Constitutional Law
👉 Criminal Law
Costs
👉 Constitutional and statutory provisions

The statutory scheme for collection of the crime stoppers fee did not improperly delegate a power to the judicial branch that was more appropriately attached to the executive branch, as argued by defendant; funds collected for the crime stoppers assistance fund were sufficiently related to the collection of evidence in criminal cases to constitute legitimate criminal justice activities. Tex. Loc. Gov't Code Ann. §§ 133.102(a)(1), (e)(2), 414.001(2); Tex. Crim. Proc. Code Ann. art. 102.013.

1 Cases that cite this headnote

On Appeal from the 339th District Court, Harris County, Texas, Trial Court Case No. 1262341

Attorneys and Law Firms

Jessica A. Caird, Devon Anderson and Alan Curry, for The State of Texas.

Jani Maselli Wood, for Kenneth Cooper McAfee.

Panel consists of Justices Keyes, Higley, and Brown.

OPINION

Evelyn V. Keyes, Justice

*1 A jury convicted appellant, Kenneth Cooper McAfee, of the murder of his wife, Janet McAfee, and the trial court assessed his punishment at confinement for ninety-nine years and a $10,000 fine.[1] In four issues, appellant argues that (1) the jury erred in rejecting his insanity defense because a preponderance of the evidence supported it; (2) the trial court erred in overruling his objection to the State's definition of "wrong" in the context of discussing the insanity defense during voir dire; (3) the trial court erred in denying his motion to suppress the testimony of Charles Storer, an attorney and friend whom he called in the course of committing the offense; and (4) the consolidated court costs were unconstitutional because they included a crime stoppers fee that does not fund any costs of the court's function.

We affirm.

Background

Appellant and the complainant, Janet McAfee, married in 1991. In 2006, appellant began to suffer from various health problems. These issues led to the breakup of appellant's marriage to Janet, and the two were in the process of getting divorced. The record contains conflicting evidence regarding the nature of appellant's physical and mental health issues and includes testimony that appellant suffered from drug and alcohol abuse, depression, anxiety and panic attacks, degenerative neurological disease, and dementia. It is undisputed that at the time of the offense appellant was living in an assisted living facility.

A. The Commission of the Offense
On May 8, 2010, Janet picked appellant up to attend the Art Car Parade, and the two spent the day together viewing the parade and later returning to the home they had shared and where Janet still lived. That evening, a panic alarm in the home was activated, and Houston Police Officer R. Nellippallil was dispatched to the home to investigate. He was met by appellant, who told Officer Nellippallil that everything was fine and it was a false alarm. Officer Nellippallil testified that appellant, whom he believed to be the homeowner, appeared normal and understood his questions. Officer Nellippallil left the home believing nothing was wrong.

Janet's alarm company also contacted the police regarding the alarm, and a second officer, Officer B. Scott, was dispatched to the home later that evening. As he approached the house, he met one of Janet's neighbors who expressed her concern for Janet, stating that she had also received an alarm call regarding the house. Officer Scott asked the neighbor to call Janet, and he rang the door bell. Appellant eventually answered the door and again told Officer Scott that everything was fine and it was a false alarm. As Officer Scott returned to his vehicle, Janet's neighbor stopped him and explained that she knew Janet and appellant were having marital issues and she was concerned for Janet's safety.

Officer Scott then returned to the door and asked to speak with Janet directly. Appellant showed his driver's license to the officer and claimed that Janet was sleeping and could not come to the door. When Officer Scott insisted on seeing Janet, appellant refused to wake her and refused to allow the officer inside to check on her. Appellant asked if Officer Scott had a search warrant requiring him to give the officer access to the home. As Officer Scott was having this discussion with appellant, he saw Janet come into view from around the corner, and he saw that she was staggering. Officer Scott asked her if she was okay, and she told him that she was not and fell to the floor. At that point, appellant immediately shut the door in Officer Scott's face and locked it. Officer Scott did not see any blood or obvious wounds on Janet at that time, but he informed dispatch of the situation and requested that Officer Nellippallil return to provide backup so that they could investigate further.

*2 While Officer Scott was discussing the situation with dispatch, he observed appellant leave the house with his dog. Officer Scott approached appellant, questioning him about Janet's condition and asking why he shut the door so abruptly. Appellant told him that Janet had been drinking and was feeling sick as a result. Officer Scott believed that appellant initially had planned to leave the home, because he was carrying keys to the vehicle and tried to start the engine, but after Officer Scott approached him, appellant put the dog in the car and then went back inside the house.

Officer Scott testified that appellant seemed normal and spoke to him calmly, trying to convince him that everything was okay and that he could leave. However, Officer Scott remained concerned about Janet's safety and waited outside the house for backup to arrive. When Officer Nellippallil arrived, they once again rang the door bell. Appellant did not answer the door. However, one of the officers spoke to appellant by phone while the other walked around the outside of the house and was able to see of Janet through a bedroom window. He

saw that she was lying on her side, unmoving, and the officer observed blood stains. Appellant continued to insist that Janet was fine and that she was just sleeping, and he refused to allow the police to enter. At one point, appellant also told the officers that he wanted to kill himself, but Officer Scott testified that he seemed calm, even while making his suicide threat.

Eventually, the police dispatched a SWAT team and a Crisis Intervention Response Team ("CIRT") to the home. Michael Hawkins, a clinician with the CIRT, attempted to communicate with appellant. Hawkins testified that his training and experience as a licensed professional counselor and his crisis intervention training equipped him to recognize people suffering from psychosis, hallucinations, and other acute mental illness. He stated that when he arrived on the scene, he spoke with appellant over the phone and attempted to get appellant to exit the house. Hawkins testified that while he was speaking with appellant, he noticed that appellant seemed sad and depressed. In fact, appellant told Hawkins that he was depressed, and Hawkins understood from his discussion with appellant that the problems had something to do with money. However, Hawkins did not observe any speech or behavior that indicated that appellant was suffering from psychosis or hallucinations. Rather, appellant was communicating clearly and his thoughts and words seemed to be "in order" and made sense in context.

Hawkins also testified that, while he was on the phone with appellant, appellant asked to speak with his attorney. Appellant initially indicated that he would come out of the home after his attorney arrived, and appellant later stated that he would hurt himself if the police entered the home. Appellant's attorney, Charles Storer, arrived on the scene at some point and spoke to appellant on the phone.

While Hawkins was talking with appellant, the SWAT team arrived and Officer M. Scales used a magnification scope to look into the bedroom where Janet was lying on the bed. Officer Scales did not observe any signs of life from Janet, but he saw appellant come into the room and lie down next to his wife. He saw appellant raise one of Janet's legs and let it fall back onto the bed, and Officer Scales stated that appellant appeared resigned at that point. As the other members of the SWAT team entered the home, Officer Scales saw appellant shoot himself in the head. Appellant was taken to a local hospital for treatment of his gunshot wound, but Janet was declared dead at the scene. An autopsy later revealed that she had been shot four times, and physical evidence in the house indicated that she had been shot somewhere outside the bedroom, had at one point been walking around after being

shot, and had been dragged through the kitchen and into the hallway. Detectives also discovered bloody towels in a clothes hamper concealed by the shower curtain.

*3 Houston Police Officer T. Moore was assigned to guard appellant while he was at the hospital, and he testified that he heard a nurse ask appellant why he was in the hospital. Appellant told the nurse he was there because he shot his wife. An HPD homicide investigator likewise visited the hospital to get appellant's statement. Appellant asked him how much time he could get for murder and then decided to wait to give a statement until his attorney was present. As part of the investigation, the officer requested to view appellant's mail while he was confined in the Harris County Jail. A few days after appellant arrived at the jail, he sent a letter to his ex-wife, Brenda McAfee, in which he wrote, "I'd say that insanity will be an interesting angle in the trial."

Appellant was tried for Janet's murder, and he asserted the affirmative defense of insanity.

B. Facts Relevant to Voir Dire
During its voir dire examination of the venire, the State explained the elements of the affirmative defense of insanity in an attempt to ascertain whether the potential jurors would properly apply the law. The prosecutor explained that there were essentially three prongs to the insanity defense and stated that a defendant asserting the insanity defense would be required to establish that he was suffering from a severe mental disease or defect and that there was a causal connection between the mental illness and the crime. Finally, the prosecutor stated, "Third prong[:] Did the defendant know that his conduct was wrong? Wrong is defined as legally, socially or morally impermissible." Appellant objected, stating, "There is no legal definition for wrong, and I object to her inserting her definition. Because since there is no legal definition, then it's up to the jury." The State replied that it used the definition "from case law." Appellant argued, "It's not in the statute law." The trial court overruled the objection.[2]

C. Facts Relevant to Appellant's Insanity Defense
A significant portion of the trial involved evidence relevant to appellant's mental state before, during, and after the offense and the validity of his insanity defense. Appellant's former supervisor, Paul Steets, testified that appellant had worked at a brokerage firm until September 2006, when he had a panic attack while at work. Following that incident, appellant was unable to focus and could not complete his work, so he went on medical leave. Steets testified that appellant needed to complete some continuing education courses to return to work

following his medical leave, but he was unable to pass the required tests and never returned to active employment. Steets was not aware of any problems between appellant and Janet, and he was not aware that appellant had ever demonstrated any anger or violence issues prior to 2006.

Janet's mother, Rosemary Foltyn, testified regarding appellant's relationship with Janet. She stated that they married in 1991. In 2006, appellant had a breakdown involving a panic attack at work and subsequent treatment for depression, which Foltyn was aware had caused Janet and appellant's marriage to suffer. Foltyn also testified that appellant had a history of alcohol and drug abuse. She recalled an incident in 2009 when she visited Janet and they returned from an outing to find appellant passed out and naked in the hallway, incapacitated due to alcohol and drug use. Foltyn also recounted an incident in May 2009 when she became concerned for appellant's safety while Janet was out of the country. When she called him, he sounded intoxicated, so she called a neighbor to check on him, and he was subsequently taken to the hospital for an "overdose situation."

*4 Foltyn believed that Janet had given appellant an ultimatum to "choose between the booze, drugs, your alcohol, or I'm leaving." Instead, appellant entered the assisted living facility because "someone had to take care of him; and [Janet] would not bring him home." Foltyn testified that this was because of appellant's drug use and Janet's concern that he "would be doing the same old thing."

Janet and appellant's neighbor, Betty McCagnan, likewise testified about the overdose incident. She testified that Foltyn called her and asked her to go check on appellant. When McCagnan arrived at appellant's home, she discovered him in the living room looking "extremely pale" with "some bruising along his legs." She understood that appellant had "[t]aken a lot of pills," so she called an ambulance, and appellant was taken to the hospital. McCagnan also testified that Janet had given appellant an ultimatum because she wanted him "to clean it up, get on with it, and she wasn't going to be around to watch him destroy himself." McCagnan testified that Janet eventually filed for divorce and that appellant went to live in an assisted living facility because Janet wanted "to protect him" and "didn't want him to have access to the internet so that he could order prescription drugs, or whatever drugs, whatever he was ordering."

McCagnan testified that appellant left the first assisted living facility, lived somewhere else for a time, and eventually moved into another assisted living facility. She recalled that

there were occasions during this time when Janet did not know where appellant was, and Janet was afraid that appellant might hurt her. McCagnan stated that Janet sent a letter to her and other neighbors at one point informing them that a friend had helped appellant escape from the "supervised facility" where he had been staying and that she did not know where he was. Janet's letter stated that she was afraid because appellant had threatened to kill her before, and she had a letter from his psychiatrist explaining that he was a danger to himself and others. Janet informed her neighbors that she had installed an alarm system and new locks and asked that they call the police if they saw anyone at the house while she was out of the country.

Appellant's friend, Charles Storer, testified regarding his relationship with appellant. Storer testified that he had known appellant for about twenty-five years and that their relationship had begun as a friendship. Storer described himself as "probably [appellant's] closest friend." Storer maintained a friendship with appellant in which they would visit socially, attending special events or going out to eat as often as twice a week. However, following appellant's breakdown at work in 2006, Storer noticed a change in appellant and did not see him as often socially. He testified that appellant's personality underwent a drastic change— appellant went from an outgoing, positive person to a withdrawn and uncommunicative person almost overnight.

After 2006, Storer tried to maintain contact with appellant but only saw him once or twice a month. Storer testified that he visited appellant in the assisted living facility and that, at one point, appellant called him to come remove him from the facility. Storer had concerns about the first assisted living facility where appellant lived, in part because of the strict regulations in place there and because of the other kinds of people living there. Appellant told Storer that he did not like the facility and asked Storer to pick him up. Storer brought appellant home with him and allowed appellant to live with him and his wife for a few weeks. However, this arrangement ended when appellant overdosed and had to be taken back to the hospital.

*5 Storer testified that he was representing appellant pro bono, without a formal, written agreement, in his divorce from Janet at the time of the murder and that he had "reservations" about the way Janet was treating appellant with regard to the divorce. He believed that Janet was trying to take advantage of appellant and that, although Janet had tried to help appellant for a while, she had essentially abandoned him. However, Storer had never heard appellant say anything disparaging about Janet. Four days before the murder, Storer

filed a counterpetition on appellant's behalf in the divorce proceeding.

Amaldo Mariano, the assistant director of appellant's assisted living facility, testified that his facility assisted its residents in their daily living by providing meals, housekeeping, and medication management. The facility was not a treatment facility or a "lockup" facility, so it was not an appropriate place for someone suffering from dementia or cognitive disorders. He recalled that, at the time appellant was admitted, appellant indicated that he suffered from depression. Mariano did not recall appellant claiming that he suffered from dementia. Mariano testified that appellant told him about various aspects of his relationship with Janet, including appellant's statement that she had threatened to report his drug usage to his employer and his statements that she had made various other threats against him. Mariano testified that appellant fed, dressed, and groomed himself without assistance, that he acted alert and did not display any cognitive issues, and that appellant seemed to function fine while he was in the facility. Mariano also agreed that the nature of the facility necessarily limited appellant's access to prescription drugs and alcohol.

Appellant's treating psychiatrist, Dr. Scott Sprabery, testified that he treated appellant from September 2007 until April 2010, approximately one month before the murder. Dr. Sprabery testified that his main practice involved prescribing medication and medication management. In September 2007, when he first saw appellant, appellant was taking an antidepressant, two anti-anxiety medications, an antipsychotic, a stimulant, and a sleep aid, and he was undergoing electroconvulsive therapy for depression. Dr. Sprabery testified that appellant presented with symptoms of depression, anxiety, poor energy, and "continuing crying spells." He testified that, at the time he first saw him, appellant had been out of work for almost a year due to his worsening depression and had had two hospitalizations from which he was still trying to recover.

Dr. Sprabery testified that while appellant was hospitalized prior to coming into his care appellant exhibited "psychotic features," such as delusions that there was something wrong with his body or believing that he had been poisoned. After completing his own evaluation of appellant, Dr. Sprabery diagnosed appellant as having "major depressive disorder, recurrent, severe" and also determined that appellant had a panic disorder. Dr. Sprabery subsequently modified appellant's medications multiple times and took appellant off of his antipsychotic medication prior to appellant's removal to an assisted living facility.

Dr. Sprabery also testified that appellant's hospital records indicated that he had a long-term stimulant addiction over approximately twenty years of his adult life and that he had concerns about prescribing stimulants for someone with appellant's history. He stated that appellant never presented with or complained of any psychosis or delusions while under his care. Dr. Sprabery also testified that appellant never informed him that he had any addiction to alcohol. If Dr. Sprabery had suspected alcohol abuse, he would have been very concerned because the combined effects of alcohol with some of the medications appellant was taking could have been very dangerous. Dr. Sprabery acknowledged that long-term use of methamphetamines and alcohol can cause depression, and he also stated that amphetamine use can cause memory deficits and change brain chemicals when used for extensive periods of time, as appellant had done over the course of twenty years.

*6 Dr. Sprabery's last appointment with appellant occurred less than a month before the murder. Appellant complained of persistent depression and sleep difficulties. Appellant did not demonstrate or complain of psychotic behavior, hallucinations, or delusions.

Dr. Jamal Rafique, the staff psychiatrist for the Harris County Jail, testified regarding the jail's records of appellant's mental health. When appellant first arrived in the jail in 2010 after Janet's murder, he underwent an initial assessment. Appellant did not report any delusions or hallucinations. In May 2010, a psychologist working with the mental health unit of the jail diagnosed appellant with major depressive disorder without psychosis. Appellant's health records also demonstrated that he had a traumatic brain injury as a result of the self-inflicted gunshot wound at the time of the murder.

Appellant's first "psychiatric incident" occurred in January 2011, after he had been incarcerated for approximately eight months. Appellant experienced delusions that people were chasing him. At that time, appellant was referred to the mental health unit for closer monitoring and mental health treatment. When Dr. Rafique first met with appellant in January 2011, he diagnosed appellant as having dementia and also believed he might have a psychotic illness. Dr. Rafique was not able to confirm his "working diagnosis" of dementia with possible psychosis because he never met with appellant again.

Dr. Richard Pollock, a neuropsychologist who was hired by the defense and worked closely with appellant's expert

psychiatrist, evaluated appellant on June 16, 2010. He diagnosed appellant with a cognitive disorder and severe major depression that manifested itself with "psychotic features." Dr. Pollock explained that this meant that appellant's disorder was accompanied by a break with reality and an inability to judge or analyze real world events properly. Dr. Pollock also determined that appellant suffered from a neurological disease of the brain and central nervous system and that he suffered from dementia as well. Dr. Pollock testified that appellant's disorders were aggravated by stress and that exposure to severe stress could cause him to develop psychotic behavior. Dr. Pollock acknowledged that his opinion that appellant suffered from a vascular neurocognitive disorder conflicted with the opinion of appellant's treating psychiatrist, who had found no neurological reasons for appellant's depression, despite reviewing the same MRI scans on which his own opinion was based.

Dr. David Axelrad testified as appellant's expert psychiatrist at trial. He reviewed extensive documentation regarding appellant's health and the reports of other doctors who had treated appellant, and he spent several hours meeting with appellant. His first meeting with appellant occurred on June 7, 2010, and he also met with appellant on April 6, 2011, February 29, 2012, and May 1, 2012. Dr. Axelrad prepared a lengthy report expressing his finding that, on the night of the offense, appellant suffered from "major depressive disorder, severe, with psychotic and melancholy features" and a "major vascular neurocognitive disorder with significant behavioral disturbance."

Dr. Axelrad testified that appellant suffered from a psychotic episode on the night he committed the offense, which mean that appellant could not know what was true or not true and would not know right from wrong. Dr. Axelrad opined that appellant did not know right from wrong when he shot his wife. He testified that it was possible for appellant to demonstrate clarity of thought and realize his acts were wrong after the psychotic episode was over.

*7 Dr. Mark Moeller testified as the State's expert psychiatrist. Dr. Moeller met with appellant on two occasions and spent about four hours reviewing appellant's medical records. He testified that there was no causal connection between appellant's disorders and the murder. Dr. Moeller likewise did not believe that appellant was suffering from dementia and did not agree with appellant's neurologist and neuropsychiatrist that appellant was suffering from a major neurovascular disorder; rather, after viewing appellant's MRIs and other records, he believed the amount of degeneration shown in the brain was normal.

Dr. Axelrad testified regarding the shortcomings in Dr. Moeller's expert report and opinion testimony. He stated that Dr. Moeller's opinion did not "address the substantive deficits in [appellant's] cognitive abilities that were identified by the two latest neuropsychologists who evaluated" appellant and who were experts in their field.

D. Facts Relevant to Admission of Storer's Phone Conversations with Appellant on the Evening of the Murder

The State called Charles Storer, appellant's friend and divorce attorney, during its case-in-chief. However, appellant moved to suppress Storer's testimony based on an assertion of attorney-client privilege, and the trial court held a hearing to determine whether appellant's statements to Storer were covered by the privilege.

At the suppression hearing, Storer testified that appellant called him on the evening that he murdered Janet and admitted that he had "done something horrible" and that he had killed his wife. Storer stated that the phone conversation was private, that appellant was talking to him as his attorney, that he gave appellant legal advice, and that when he arrived at the scene later in the evening, he introduced himself to the police as appellant's attorney. Storer further testified that appellant had not waived his attorney-client privilege.

On cross-examination, the State established that Storer had been an attorney for approximately thirty years and that his main practice areas were family law, probate, and personal bankruptcy. Several years after he met appellant, Storer represented appellant in his divorce from his first wife. After that time, Storer maintained a personal, social relationship with appellant. Storer also considered Janet a friend.

Janet filed for divorce in March 2010, and Storer began to represent appellant in the divorce proceeding on May 4, 2010, approximately four days before the murder. Storer stated that he and appellant had a verbal attorney-client agreement, and he admitted that he had never agreed to represent appellant in any criminal matters and that he was not a criminal-defense attorney.

Storer testified that on the night of May 8, 2010, when appellant called to tell him that he had shot Janet, he immediately called 9–1–1 and reported that appellant, whom he described in the 9–1–1 call as a friend, had just shot his wife. Storer then drove to the house where appellant had shot Janet and made a statement to a police officer at the scene.

Regarding the specific legal advice that he gave appellant on the phone that night, Storer testified that appellant told him that "they were going to execute him for what he had done to his wife," and Storer told him that it was not a capital crime and "they're not going to try to kill you over it." Storer acknowledged that he would have given the same advice to a client or a friend.

Storer also acknowledged that he informed the police that he never represented appellant as his criminal lawyer. According to the statement that Storer made to the police, the majority of his conversation with appellant involved appellant's representations that he was going to kill himself and Storer's attempts to talk him out of committing suicide. Storer acknowledged that when he gave his statement to the police regarding his conversations with appellant, it never occurred to him to assert the attorney-client privilege on appellant's behalf. However, the evidence also demonstrated that the police were aware that Storer had acted as appellant's attorney in his divorce proceedings, and appellant repeatedly told the SWAT officers that he wanted to talk to his attorney and that he would not come out of the house until his attorney arrived. Storer further testified that he had helped facilitate appellant's hiring of a criminal defense attorney, and he had maintained a friendship with appellant while he was incarcerated in the Harris County Jail.

*8 At the suppression hearing, appellant argued that Storer's testimony regarding his conversations with appellant on the evening of the murder was inadmissible because the conversations were protected by the attorney-client privilege. Appellant argued that, although he eventually hired criminal-defense counsel, at the time of the offense he did not have any other counsel—Storer was the only attorney he had. The State argued that the purpose of the privilege was to protect attorney-client communications pertaining to legal representation and that it would be an abuse of the privilege to protect a defendant's inculpatory statements solely on the basis that they were made to a friend who also happened to be an attorney. The State argued that there was no on-going attorney-client relationship between Storer and appellant at the time of the communications, that Storer never represented appellant in this or any other criminal matter, and that appellant called Storer because Storer was his best friend, not because he was a lawyer.

The trial court ruled that the attorney-client privilege did not exist and denied appellant's motion to suppress.

Storer testified before the jury regarding his twenty-five year friendship with appellant, just as he had in the suppression hearing. Regarding the night of the murder, Storer testified that he had "[m]aybe six or eight" phone conversations with appellant. He stated that he left the scene of the murder around midnight and that he visited the police station the next day to give a statement regarding what he knew about the murder.

Following the testimony of numerous other witnesses, during the rebuttal phase of trial, the State offered the recording of the 9–1–1 call Storer made and again called him to the stand. Appellant renewed his objection to the admission of Storer's testimony, which the trial court noted for the record.

Storer testified that he called 9–1–1 "almost immediately" after his first phone conversation with appellant on the evening of the murder and then he went to the scene. He recalled that appellant told him that "that something horrible has happened, that he had just shot Janet." Storer recalled that appellant had "snapped," that appellant believed he was in trouble, and that appellant wanted to commit suicide. Storer and appellant discussed where appellant wanted to be buried, and appellant asked him to look after his son. Storer also recalled appellant's telling him that he believed his life was over and that either he was going to spend the rest of his life in jail for killing Janet or that he would be executed.

E. The Jury's Verdict and the Trial Court's Judgment
The jury rejected appellant's affirmative defense and found him guilty of murder. The trial court assessed his punishment at ninety-nine years' confinement and assessed a $10,000 fine. The trial court also assessed the statutorily required $133 in consolidated court costs.

Insanity Defense

In his first issue, appellant challenges the factual sufficiency of the jury's rejection of his insanity defense. Stated another way, appellant argues that he offered so much evidence in support of his insanity defense and the State offered so little evidence rebutting his defense that the jury's rejection of his affirmative defense was against the great weight and preponderance of the evidence. *See Matlock v. State,* 392 S.W.3d 662, 670 n. 29 (Tex.Crim.App.2013) ("Technically, a defendant's claim is not one of 'factual sufficiency.' ... The

defendant is claiming that his evidence is more than sufficient to support his affirmative defense, while the State's evidence is insufficient to rebut it.").

A. Standard of Review
[1] [2]The Texas Court of Criminal Appeals has adopted the civil standard of factual-sufficiency review for challenges to the rejection of an affirmative defense because the burden of proof is that of "preponderance of the evidence," the same burden applied in civil proceedings. *Id.* at 671 (citing *Meraz v. State,* 785 S.W.2d 146, 149, 153–55 (Tex.Crim.App.1990)). In making a factual-sufficiency claim, the defendant is asserting that, considering the entire body of evidence, the jury's adverse finding on his affirmative defense was so "against the great weight and preponderance" of the evidence as to be manifestly unjust. *Id.*

*9 [3] [4] [5]Accordingly, we must view the entirety of the evidence in a neutral light. *Id.* However, we "may not usurp the function of the jury by substituting [our] judgment in place of the jury's assessment of the weight and credibility of the witnesses' testimony." *Id.* We may "sustain a defendant's factual-sufficiency claim only if, after setting out the relevant evidence and explaining precisely how the contrary evidence greatly outweighs the evidence supporting the verdict, [we] clearly state[ ] why the verdict is so much against the great weight of the evidence as to be manifestly unjust, conscience-shocking, or clearly biased." *Id.* If we determine that the evidence supporting an affirmative defense so greatly outweighs the State's contrary evidence that the verdict is manifestly unjust, then we may reverse the trial court's judgment and remand for a new trial. *Id.* at 672.

[6] [7]Insanity is an affirmative defense, which must be proved by a preponderance of the evidence. Tex. Penal Code Ann. §§ 2.04, 8.01 (Vernon 2011). To establish the affirmative defense of insanity, the defendant must prove "that, at the time of the conduct charged, the actor, as a result of severe mental disease or defect, did not know that his conduct was wrong." *Id.* § 8.01(a). The law presumes that the accused is sane, and the accused bears the burden of proving by a preponderance of the evidence that he is insane. *Martinez v. State,* 867 S.W.2d 30, 33 (Tex.Crim.App.1993); *see Ruffin v. State,* 270 S.W.3d 586, 591–92 (Tex.Crim.App.2008) ("Texas law ... presumes that a criminal defendant is sane and that he intends the natural consequences of his acts.").

[8] [9] [10]The insanity defense focuses on whether the accused understood the nature of his action and whether he knew he should not do it. *Ruffin,* 270 S.W.3d at 592; *Bigby v.*

*State,* 892 S.W.2d 864, 877–78 (Tex.Crim.App.1994). In the context of the insanity defense, the word "wrong" means illegal. *Ruffin,* 270 S.W.3d at 592. If the accused knows that his conduct is "illegal" by societal standards, then he understands that his conduct is wrong, even if, due to a mental disease or defect, he thinks his conduct is morally justified. *See id.* Thus, proof of a mental disease or defect alone is not sufficient to establish an affirmative defense of insanity. *Nutter v. State,* 93 S.W.3d 130, 132 (Tex.App.–Houston [14th Dist.] 2001, no pet.); *see Bigby,* 892 S.W.2d at 877–78 ("The issue of insanity is not strictly medical. It also involves both legal and ethical considerations.").

[11]Although jurors may not arbitrarily disregard expert testimony as to insanity, neither may they give conclusive effect to such testimony. *Graham v. State,* 566 S.W.2d 941, 950–51 (Tex.Crim.App.1978) ("Opinion testimony does not establish material facts as a matter of law."). The circumstances of the crime itself are also important in determining the mental state of the accused at the time of the commission of the offense, and evidence indicating knowledge of wrongful conduct, such as an attempt to conceal incriminating evidence or elude law enforcement, may be considered.*Id.* at 951; *see also Torres v. State,* 976 S.W.2d 345, 347–48 (Tex.App.–Corpus Christi 1998, no pet.) (holding that, in reaching its decision on insanity, jury may consider circumstantial evidence, including defendant's demeanor before and after committing crime, defendant's attempts to evade police or conceal incriminating evidence, defendant's expressions of regret or fear of consequences of his actions, and any other possible explanations for defendant's behavior).

[12]Whether the defense of insanity was proved is a decision that lies within the province of the jury, both as to the credibility of witnesses and the weight of the evidence and as to the limits of the defense. *Bigby,* 892 S.W.2d at 878; *see also Reyna v. State,* 116 S.W.3d 362, 367 (Tex.App.–El Paso 2003, no pet.) ("The issue of insanity at the time of the offense lies within the province of the jury, and we will overturn its decision only where insanity is undisputed or resolved to one end of the spectrum outside the realm of discretion.").

B. Analysis
*10 [13]Here, appellant argues that the great weight and preponderance of the evidence presented at trial supports his claim of insanity, and, therefore, the jury erred in rejecting his affirmative defense. Appellant argues that the State's expert witness, Dr. Moeller, did not conduct a thorough investigation and "only reiterated the facts of the offense in determining [appellant] was sane at the time of the offense." He points to

the inadequacies of Dr. Moeller's report and expert testimony in comparison to the testimony and report of his own expert, Dr. Axelrad, who conducted a thorough evaluation of appellant and his medical records and determined that appellant did not know right from wrong at the time of the offense. Appellant also relies on evidence indicating that he had no prior criminal history, and he argues that it was not until he became ill and his brain degenerated that he and Janet began to have marital difficulties. He argues that a preponderance of the evidence established that he was "a very sick man"—"[a] once powerful and wealthy stockbroker forced to leave his home ... and go to an assisted living facility for dementia."

The record contains evidence from Dr. Rafique, the jail psychiatrist, and appellant's expert witnesses, Dr. Axelrad and Dr. Pollock, that appellant suffered from delusions, dementia, and possible psychosis in addition to his depression, and those doctors believed that appellant's disorders were attributable to a degenerative neurological disorder. Dr. Axelrad opined that appellant did not know that his actions were wrong at the time he committed the murder. On the other hand, the State's expert witness, Dr. Moeller, opined that appellant was not suffering from a degenerative neurological disorder and that appellant was sane at the time he committed the offense, in conflict with the opinions of Dr. Pollock and Dr. Axelrad. Dr. Moeller's expert report is shorter than Dr. Axelrad's report, and Dr. Moeller did not place the same value on the opinions and reports of some of the experts that Dr. Axelrad relied upon in reaching his opinion. However, this fact by itself does not indicate that the jury's rejection of appellant's insanity defense went against the great weight and preponderance of the evidence.

Appellant construes the evidence as demonstrating that he was "a very sick man" who was forced to move to an assisted living facility for dementia. This view of the evidence does not account for the testimony of Rosemary Foltyn, Betty McCagnan, Charles Storer, and Dr. Sprabery that appellant had a history of drug and alcohol abuse that could also have contributed to his mental disorders. Foltyn testified that appellant had a history of drug and alcohol abuse, and Dr. Sprabery testified regarding the negative effects drug and alcohol abuse could have had on appellant's health. Furthermore, several witnesses, including Mariano, McCagnan, and Foltyn, testified that appellant was not placed in assisted living due to dementia, but rather as a result of his drug issues.

There was no medical evidence indicating that appellant suffered from anything other than severe major depressive

disorder and anxiety until after he committed the murder, shot himself in the face, and was incarcerated in the Harris County Jail. Appellant's treating psychiatrist, Dr. Sprabery, testified that he treated appellant up until the month preceding the offense and he had never had any reason to believe that appellant suffered from psychosis, delusions, hallucinations, dementia, or any degenerative neurological disorder or other physiological reason for his mental disorders. Dr. Rafique, the jail psychiatrist, testified that the jail records demonstrated only that appellant suffered from major depressive disorder until January 2011, months after the murder, at which time appellant began experiencing symptoms of psychosis and dementia. Dr. Pollock, one of appellant's expert witnesses, conceded that his diagnosis of degenerative neurological disorder conflicted with that of appellant's treating psychiatrist, who did not believe appellant's disorders were the result of a physical disorder. Thus, while there were conflicting expert opinions, we cannot say the overwhelming weight of the medical evidence indicated that appellant suffered from dementia or psychosis at the time he committed the murder. *See* Tex. Penal Code Ann. § 8.01(a) (providing that affirmative defense of insanity applies to actor who did not know his conduct was wrong "as a result of severe mental disease or defect").

*11 Furthermore, contrary to appellant's assertion, it is proper for the jury to consider the circumstances of the crime itself. *See Graham,* 566 S.W.2d at 950 (stating that although jurors may not arbitrarily disregard expert testimony as to insanity, neither may they give conclusive effect to such testimony); *see also Torres,* 976 S.W.2d at 347–48 (holding that, in reaching its decision on insanity, jury may consider circumstantial evidence, including defendant's demeanor before and after committing crime, defendant's attempts to evade police or conceal incriminating evidence, defendant's expressions of regret or fear of consequences of his actions, and any other possible explanations for defendant's behavior).

The record indicates that, on the night of the offense, appellant appeared normal when Officers Nellipallil and Scott came to investigate the security alarm and he told them it was a false alarm. He lied to them and attempted to conceal Janet from them, closing the door in Officer Scott's face when Janet stumbled into view, and the officers originally believed his lie. When the officers returned to the house to check on Janet, appellant asked for a warrant before he would allow them to enter the home. Appellant tried to flee with his car keys and his dog, but he left the dog in the vehicle and returned to the house when he was confronted by the officers.

After the officers discovered the crime, appellant insisted on contacting his lawyer and refused to leave his house. Hawkins, the crisis intervention counselor, testified that appellant did not demonstrate any of the characteristics of someone experiencing psychosis or hallucinations. At the hospital, appellant told a nurse that he had shot his wife, and he refused to give a statement to police regarding the incident before consulting with his lawyer. This evidence regarding appellant's demeanor before, during, and after the crime, his attempts to evade police or conceal incriminating evidence, and his expressions of regret or fear for the consequences of his actions is relevant to the jury's decision to reject appellant's insanity defense. *See Torres,* 976 S.W.2d at 347–48; *see also Robinson v. State,* 236 S.W.3d 260, 267–68 (Tex.App.–Houston [1st Dist.] 2007, pet. ref'd) (holding that evidence of flight may demonstrate consciousness of guilt). Finally, the evidence from multiple witnesses regarding appellant's history of drug abuse and evidence that appellant and Janet were divorcing provide other possible explanations for appellant's behavior. *See Torres,* 976 S.W.2d at 347–48.

We conclude that there was sufficient evidence from which the jury could determine that appellant was aware at the time he murdered Janet that his conduct was wrong. *See* Tex. Penal Code Ann. § 8.01(a); *Bigby,* 892 S.W.2d at 877–78 (stating that insanity defense focuses on whether accused understood nature of his action and whether he knew he should not do it). We cannot conclude that the evidence supporting appellant's affirmative defense so greatly outweighs the State's contrary evidence that the jury's verdict was manifestly unjust. *See Matlock,* 392 S.W.3d at 671–72.

We overrule appellant's first issue.

### The State's Definition of "Wrong" During Voir Dire

In his second issue, appellant argues that the trial court erred in overruling his objection to the State's use of an improper definition of "wrong" during voir dire.

Here, the State defined the term "wrong" in the context of its attempt to ascertain whether the potential jurors would properly apply the law of insanity. The prosecutor stated that "[w]rong is defined as legally, socially or morally impermissible." Appellant objected, stating, "There is no legal definition for wrong, and I object to her inserting her definition. Because since there is no legal definition, then it's up to the jury." The State replied that it used the definition

"from case law." Appellant argued, "It's not in the statute law." The trial court overruled the objection.

*12 On appeal, appellant argues that the trial court erred in allowing the State to give "its own definition of wrong" and that the prosecutor's statement of law regarding the definition of "wrong" was incorrect. *See Thompson v. State,* 95 S.W.3d 537, 541 (Tex.App.–Houston [1st Dist.] 2002, no pet.) (holding that voir dire questions that misstate law are improper). Appellant argues that, by overruling his objection, "the [trial] court gave the definition its imprimatur" and impinged on the jury's ability to assign the term any meaning which is acceptable in common parlance.

A. Standard of Review

[14] [15] [16] [17]"The trial court has broad discretion over the process of selecting a jury." *Fuller v. State,* 363 S.W.3d 583, 585 (Tex.Crim.App.2012) (quoting *Sells v. State,* 121 S.W.3d 748, 755–56 (Tex.Crim.App.2003)). We will not disturb the trial court's ruling on the propriety of a particular voir dire question absent an abuse of discretion. *Id.* A trial court abuses its discretion when it prohibits a proper question about a proper area of inquiry. *Id.* A question is proper if it seeks to discover a juror's views on an issue applicable to the case. *Id.* However, voir dire questions that misstate the law are improper. *Thompson,* 95 S.W.3d at 541.

[18]Generally, a prosecutor's statements during voir dire will not constitute error unless they are contrary to the trial court's charge. *See Wilder v. State,* 111 S.W.3d 249, 253 (Tex.App.–Texarkana 2003, pet. ref'd). The Court of Criminal Appeals has held that voir dire questions regarding a particular, statutorily undefined term are proper when the question seeks to discover the venire members' views on an issue applicable to the trial, is not repetitious, and is not in an improper form. *Fuller,* 363 S.W.3d at 586 (quoting *Woolridge v. State,* 827 S.W.2d 900, 906 (Tex. Crim.App.1992)). The court stated,

> [T]he fact that no definition will be provided [in the jury charge] for a term does not render a prospective juror's understanding of that term irrelevant. To the contrary, that understanding becomes more crucial to the intelligent exercise of either the State's or the defendant's peremptory challenges because there is no definition to guide what could be a juror's skewed perception of the term.

*Id.* (stating, in context of analyzing allegedly improper definition of "beyond a reasonable doubt,"

that "inquiry into a prospective juror's understanding of what proof beyond a reasonable doubt means constitutes a proper question regardless of whether the law specifically defines that term. The jury's ability to apply the correct standard of proof remains an issue in every criminal case").

[19] [20]Rather, when a term is undefined in the charge, we presume that the jury "attach[ed] a common understanding to the meaning of the term [ ]." *Smith v. State,* 297 S.W.3d 260, 275 (Tex.Crim.App.2009). A trial court's erroneous ruling on issues relating to questioning a venire panel about its understanding of the burden of proof is non-constitutional error subject to a harm analysis under Texas Rule of Appellate Procedure 44.2(b). *See* Tex.R.App. P. 44.2; *Fuller,* 363 S.W.3d at 587–89; *Rich v. State,* 160 S.W.3d 575, 577 (Tex.Crim.App.2005). We review non-constitutional error to determine whether it affected an appellant's substantial rights. Tex.R.App. P. 44.2(b); *Johnson v. State,* 43 S.W.3d 1, 4 (Tex.Crim.App.2001). An error affects a substantial right "when the error has a substantial and injurious effect or influence" on the verdict. *Id.*

B. Analysis

*13 [21]Preliminarily, we note that appellant's complaint is not one of charge error—the jury charge did not define the term "wrong," nor does appellant argue that the charge should have included a definition of that term. *See Kirsch v. State,* 357 S.W.3d 645, 651–52 (Tex.Crim.App.2012) (holding that fact that appellate court defined statutorily-undefined term when reviewing sufficiency of the evidence in one case does not necessarily mean definition must or even should be provided to jury in future cases); *Ramos v. State,* 303 S.W.3d 302, 308 (Tex.Crim.App.2009) (holding that, as general rule, terms need not be defined in jury charge if they are not statutorily defined). Thus, appellant's reliance on the reasoning in *Kirsch,* which analyzed the harm of providing an instruction to the jury in the jury charge itself, is misplaced in this case. *See* 357 S.W.3d at 651–52.

The question in this case is whether the trial court erred, as a matter of law, by allowing the State to give an improper definition of the word "wrong" to the jury that was *not* later incorporated in an

instruction in the charge. The Penal Code does not define "wrong." However, the Court of Criminal Appeals has held that "wrong" in the context of the affirmative defense of insanity means "illegal" by societal standards. *Ruffin,* 270 S.W.3d at 592; *see also Bigby,* 892 S.W.2d at 878 (holding that focus of insanity inquiry should not be on appellant's morality, but should instead be on "whether [he] understood the nature and quality of his action and whether it was an act he ought to do.... By accepting and acknowledging his action was 'illegal' by societal standards, [Bigby] understood that others believed his conduct was 'wrong' ") (internal citations omitted).

The prosecutor's definition of "wrong" as "legally, socially, or morally impermissible" expressed a commonly accepted meaning of the word that was somewhat broader than the strict legal definition of wrong as "illegal" by societal standards. *Compare Ruffin,* 270 S.W.3d at 592 (holding that "wrong," in context of insanity defense, means "illegal" by societal standards) *and Bigby,* 892 S.W.2d at 878 (holding that focus of insanity inquiry should be on "whether [appellant] understood the nature and quality of his action and whether it was an act he ought to do.... By accepting and acknowledging his action was 'illegal' by societal standards, [Bigby] understood that others believed his conduct was 'wrong' "), *with* Merriam–Webster's Collegiate Dictionary 1447 (11th ed.2003) (defining "wrong" as "not according to the moral standard" or "not right or proper according to a code, standard, or convention"). Appellant does not identify any other point in the proceedings where the State's definition of the word "wrong" was used, and it is undisputed that the jury charge did not include any definition of the word "wrong." We thus presume that the jury "attach[ed] a common understanding to the meaning of term[ ]." *See Smith,* 297 S.W.3d at 275 (holding that jurors are presumed to attach common understanding of meaning of terms that are not defined in jury charge). Moreover, that meaning was closely similar to the definition in case law and, if anything, was more favorable to appellant than the strict legal definition.

Assuming without deciding that the trial court erred by permitting the prosecution to define the word "wrong" during voir dire by using a commonly accepted definition that was broader than the definition set out in case law, we cannot conclude

that the error had a substantial or injurious effect or influence on the verdict against appellant or that appellant's substantial rights were affected, as required to demonstrate reversible error. *See* Tex.R.App. P. 44.2(b); *Johnson,* 43 S.W.3d at 4.

\*14 We overrule appellant's second issue.

## Admission of Storer's Testimony

In his third issue, appellant argues that the trial court erred in denying his motion to suppress the testimony of Charles Storer, his attorney and friend whom he called in the course of committing the offense.

### A. Standard of Review

[22] [23] "In reviewing a trial court's ruling on a motion to suppress, appellate courts must view the evidence in the light most favorable to the trial court's ruling." *Johnson v. State,* 414 S.W.3d 184, 192 (Tex.Crim.App.2013); *see also Shepherd v. State,* 273 S.W.3d 681, 684 (Tex.Crim.App.2008) (holding that we review denial of motion to suppress evidence for abuse of discretion). When, as here, a trial court makes explicit fact findings, we must determine whether the evidence viewed in the light most favorable to the trial court's ruling supports the fact findings. *See Johnson,* 414 S.W.3d at 192; *see also State v. Cullen,* 195 S.W.3d 696, 699 (Tex.Crim.App.2006) (holding that trial court's findings of fact and conclusions of law are sufficient if they are "recorded in some way, whether written out and filed by the trial court, or stated on the record at the hearing").

[24] [25] [26] [27] We review motions to suppress pursuant to a bifurcated standard under which the trial court's determinations of historical facts and mixed questions of law and fact that rely on credibility are granted almost total deference when supported by the record. *Johnson,* 414 S.W.3d at 192. However, for questions of law or mixed questions of law and fact that do not depend on the evaluation of credibility and demeanor, we review the trial court's ruling de novo. *Id.* At a suppression hearing, the trial court "is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony." *Wiede v. State,*

214 S.W.3d 17, 24–25 (Tex.Crim.App.2007). The trial court may choose to believe or disbelieve any part or all of a witness's testimony. *State v. Ross,* 32 S.W.3d 853, 855 (Tex.Crim.App.2000). We sustain the trial court's ruling if it is reasonably supported by the record and correct on any theory of law applicable to the case. *Laney v. State,* 117 S.W.3d 854, 857 (Tex.Crim.App.2003).

[28]Confidential communications between client and counsel made to facilitate legal services are generally insulated from disclosure. *See* Tex.R. Evid. 503(b)(1), 61 Tex. B.J. 374, 381 (Tex. & Tex.Crim.App.1998, amended 2015) (providing that client has privilege to refuse to disclose and to prevent any other person from disclosing confidential communications between client and lawyer made for purpose of facilitating rendition of professional legal services to client);[3] *Cameron v. State,* 241 S.W.3d 15, 19 (Tex.Crim.App.2007). Thus, the scope of the attorney-client privilege as set out in the rules of evidence is limited to communications "made by a client seeking legal advice from a lawyer in her capacity as such and the communication must relate to the purpose for which the advice is sought." *State v. DeAngelis,* 116 S.W.3d 396, 404 (Tex.App.–El Paso 2003, no pet.). "[T]he proof, express or circumstantial, must indicate the client's desire for confidence and secrecy." *Id.*

*15 "A communication is 'confidential' if not intended to be disclosed to third persons other than those to whom disclosure is made in furtherance of the rendition of professional legal services to the client or those reasonably necessary for the transmission of the communication." Tex.R. Evid. 503(a)(5), 61 Tex. B.J. at 381; *DeAngelis,* 116 S.W.3d at 404. Rule 503(b)(2) adds a special rule of privilege for criminal cases: "In criminal cases, a client has a privilege to prevent the lawyer or lawyer's representative from disclosing any other fact which came to the knowledge of the lawyer or the lawyer's representative by reason of the attorney-client relationship." Tex.R. Evid. 503(b)(2), 61 Tex. B.J. at 381; *Cameron,* 241 S.W.3d at 19.

[29] [30]"In general, privileges are exclusionary rules of evidence that may be used to suppress relevant evidence." *Cameron,* 241 S.W.3d at 19. The rule specifies that the privilege may be claimed by the client or the attorney on behalf of the client. Tex.R. Evid. 503(c); 61 Tex. B.J. at 382; *Cameron,* 241 S.W.3d at 19; *see also Carmona v. State,* 941 S.W.2d 949, 953 (Tex.Crim.App.1997) (holding that attorney-client privilege is designed for client's benefit by guaranteeing confidentiality to promote forthright communications between lawyer and client). The client can waive the privilege by voluntarily disclosing or consenting to the disclosure of a significant part of the privileged matter. Tex.R. Evid. 511(1), 61 Tex. B.J. at 387;[4] *Carmona v. State,* 947 S.W.2d 661, 663 (Tex.App.–Austin 1997, no pet.). Disclosure by the attorney does not waive the privilege absent the client's consent. *Carmona,* 947 S.W.2d at 663 (citing *Cruz v. State,* 586 S.W.2d 861, 865 (Tex.Crim.App.1979)).

[31]A party asserting a privilege has the burden of showing that the privilege applies. *Peto v. State,* 51 S.W.3d 326, 327 (Tex.App.–Houston [1st Dist.] 2001, pet. ref'd); *Carmona,* 947 S.W.2d at 663 ("The privilege claimant must prove the existence of the privilege.") (citing *Austin v. State,* 934 S.W.2d 672, 674 (Tex.Crim.App.1996), and *Carmona,* 941 S.W.2d at 954 n. 6).

[32] [33] [34] [35]Once the privilege has been established, the party seeking to establish waiver of the privilege has the burden of going forward with evidence that supports a finding of waiver. *Carmona,* 947 S.W.2d at 663 (citing *Carmona,* 941 S.W.2d at 953). Waiver may be inferred from the totality of the circumstances and reasonable inferences. *Id.* The disclosure of the privileged material by defense counsel is relevant in determining waiver. *Id.* After the State has gone forward with evidence supporting waiver of the privilege, the party claiming the privilege "may find it wise to present evidence of no waiver." *Id.*

[36] [37]We review the trial court's decision on the applicability of a privilege for an abuse of discretion. *Id.* at 664. We can reverse a decision only if "the trial court applied an erroneous legal standard, or when no reasonable view of the record could support the trial court's conclusion under the correct law and the facts viewed in the light most favorable to its legal conclusion." *Id.* (quoting *DuBose v. State,* 915 S.W.2d 493, 498 (Tex.Crim.App.1996)).

B. Analysis

*16 [38]Here, appellant moved to suppress Storer's testimony regarding the content of appellant's phone calls to him on the night of the murder based on an assertion of attorney-client privilege. The trial court held a hearing and determined that the attorney-client privilege did not apply to the phone calls appellant made in the course of committing the offense.

The record contains conflicting evidence regarding the nature of appellant's relationship with Storer at the time the phone calls occurred. Storer testified that he communicated that night with appellant as his attorney and provided him with legal advice. The record also contained evidence that appellant told police that he wanted to see his attorney and that when Storer arrived on the scene, he introduced himself as appellant's attorney.

However, it was undisputed that appellant and Storer were long-time friends, and Storer testified that he was probably appellant's closest friend. Appellant did not call Storer's legal office; rather, he called Storer's cell phone. Storer also acknowledged that he did not typically practice criminal defense law. During the suppression hearing, he testified that the advice he gave appellant consisted of informing him that the murder was not a capital offense for which he could receive the death penalty, and Storer admitted that this was the type of advice he would give to anyone, whether they were a client or a friend. The remaining content of the phone conversations—e.g., appellant's assertion that he wanted to commit suicide and his wishes for his burial, and Storer's attempt to talk appellant out of killing himself—are more typically conversations one would have with a friend, not one's attorney. Storer acknowledged, both to police officers on the day following the murder and at trial, that he had never represented appellant in a criminal matter. And Storer acknowledged that when he called 9–1–1 and later made his statement to police, it did not occur to him to assert the attorney-client privilege on appellant's behalf.

Viewing the evidence in the light most favorable to the trial court's ruling, as we must, we conclude there is evidence to support the trial court's ruling that these communications were not confidential communications between client and counsel made to

facilitate legal services. *See* Tex.R. Evid. 503(a)(5), 61 Tex. B.J. at 381 ("A communication is 'confidential' if not intended to be disclosed to third persons other than those to whom disclosure is made in furtherance of the rendition of professional legal services to the client or those reasonably necessary for the transmission of the communication."); *Cameron,* 241 S.W.3d at 19. Nor did these phone calls constitute the disclosure of "any other fact which came to the knowledge of the lawyer or the lawyer's representative by reason of the attorney-client relationship." *See* Tex.R. Evid. 503(b)(2), 61 Tex. B.J. at 381; *Cameron,* 241 S.W.3d at 19. Rather, the evidence supports the trial court's conclusion that appellant's communications were made to Storer in his capacity as appellant's close friend, and not as an attorney providing legal representation.

Although the record contains some conflicting evidence, the trial court is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony at a suppression hearing, and we are to grant almost total defense to the trial court's determinations of historical fact and mixed questions of law and fact that rely on credibility when they are supported by the record. *See Johnson,* 414 S.W.3d at 192; *Wiede,* 214 S.W.3d 17, 24–25. We cannot conclude that the trial court "applied an erroneous legal standard" or that "no reasonable view of the record could support the trial court's conclusion" that appellant failed to meet his burden of establishing that the attorney-client privilege applied to his communications. *See Carmona,* 947 S.W.2d at 664.

*17 Given this record, we cannot conclude that the trial court abused its discretion in finding that the attorney-client privilege did not apply to these communications. *See Johnson,* 414 S.W.3d at 192 (evidence must be viewed in light most favorable to trial court's ruling); *Carmona,* 941 S.W.2d at 953 (attorney-client privilege is designed to guarantee confidentiality to promote forthright communication between lawyers and client); *see also DeAngelis,* 116 S.W.3d at 404 (attorney-client privilege applies to communications "made by a client seeking legal advice from a lawyer in her capacity as such and the communication must relate to the purpose for which the advice is sought" and "the proof ... must indicate the client's desire for confidence and secrecy.").

We overrule appellant's third issue.

### Constitutionality of Court Costs

Following his conviction, the trial court assessed the mandatory $133 in consolidated court costs. In his fourth issue, appellant complains that a portion of the court costs, the "crime stoppers fee," does not fund any cost for the court's function and thus is facially unconstitutional. Appellant argues that this fee should more properly be characterized as a tax and that requiring courts to collect costs for such a tax or program that is not refunded back to the courts is a violation of the separation of powers clause because it imposes an executive function on the judicial branch.

A. Standard of Review

[39] [40] [41]In addressing a constitutional challenge, this court "must begin with the presumption that the statute is valid and that the Legislature did not act arbitrarily or unreasonably in enacting it." *State v. Rosseau,* 396 S.W.3d 550, 557 (Tex.Crim.App.2013); *Salinas v. State,* 426 S.W.3d 318, 326 (Tex.App.–Houston [14th Dist.] 2014, pet. granted). The party challenging the statute "has the burden to establish its unconstitutionality." *Rosseau,* 396 S.W.3d at 557; *Salinas,* 426 S.W.3d at 326. "[T]o prevail on a facial challenge, a party must establish that the statute always operates unconstitutionally in all possible circumstances." *Rosseau,* 396 S.W.3d at 557; *Salinas,* 426 S.W.3d at 326.

[42]The Texas Constitution contains an express separation-of-powers provision. Tex. Const., art. II, § 1; *Ex parte Lo,* 424 S.W.3d 10, 28 (Tex.Crim.App.2013) (op. on reh'g). "This division ensures that power granted one branch may be exercised by only that branch, to the exclusion of others," and "therefore requires that 'any attempt by one department of government to interfere with the powers of another is null and void.' " *Ex parte Lo,* 424 S.W.3d at 28 (quoting *Meshell v. State,* 739 S.W.2d 246, 252 (Tex.Crim.App.1987)). The Court of Criminal Appeals has recently held:

We have viewed the Texas [separation-of-powers] provision as generally susceptible to violation in one of two ways:

> (1) when one branch of government assumes or is delegated a power "more properly attached" to another branch, or

> (2) when one branch unduly interferes with another branch so that the other branch cannot effectively exercise its constitutionally assigned powers.

*Id.* (quoting *Ex parte Gill,* 413 S.W.3d 425, 431–32 (Tex.Crim.App.2013)). Appellant argues that the statutory scheme for collection of the crime stoppers fee improperly delegates a power to the judicial branch that is more appropriately attached to the executive branch. *See id.*

Regarding the allocation of court costs addressed by appellant, Texas Local Government Code section 133.102(a)(1) provides that a person convicted of a felony offense "shall pay as a court cost, in addition to all other costs," $133. Tex. Local Gov't Code Ann. § 133.102(a)(1) (Vernon Supp.2014). The Local Government Code further provides that these court costs "shall be collected and remitted to the comptroller" and that the comptroller shall allocate a statutorily determined percentage of the court costs according to a list of specific accounts and funds. *Id.* § 133.102(b), (e); *see also* Tex. Const. art. IV, § 1 (providing that Comptroller of Public Accounts is one of six officers of state's executive department). Among those funds is "crime stoppers assistance," which is to receive 0.2581 percent of the consolidated court costs, or, in this case, approximately $0.34. *See* Tex. Local Gov't Code Ann. § 133.102(e)(2).

*18 Texas Code of Criminal Procedure chapter 102 provides specifically for the allocation of the crime stoppers assistance account. Tex.Code Crim. Proc. Ann. art. 102.013 (Vernon 2006). Specifically, article 102.013 provides:

> The legislature shall appropriate funds from the crime stoppers assistance account to the Criminal Justice Division of the Governor's Office. The Criminal Justice Division may use

10 percent of the funds for the operation of the toll-free telephone service under Section 414.012, Government Code, and shall distribute the remainder of the funds only to crime stoppers organizations. The Criminal Justice Division may adopt a budget and rules to implement the distribution of these funds.

*Id.* art. 102.013(a).

The Texas Government Code contains provisions defining and regulating crime stoppers organizations. It defines "crime stoppers organizations" to include either private or public organizations that pay "rewards to persons who report to the organization information about criminal activity and that forward[ ] the information to the appropriate law enforcement agency." Tex. Gov't Code Ann. § 414.001(2) (Vernon 2012). The Government Code also provides for a "Texas Crime Stoppers Council," organized under the criminal justice division of the governor's office, to "encourage, advise, and assist in the creation of crime stoppers organizations" and to "encourage, advise, and assist crime stoppers organizations in implementing" programs, among other duties. *Id.* §§ 414.002(a), 414.005 (Vernon 2012 & Supp.2014).

B. Analysis

[43]Here, appellant complains that the "crime stoppers fee," included in the consolidated court costs assessed against him, is not actually a cost of court, but is instead a tax. He argues that delegating the collection of this tax to the judicial branch violates the separation of powers clause of the Texas Constitution by delegating a power to the judicial branch that is more appropriately attached to the executive branch. Thus, he argues, the court costs are facially unconstitutional.

Our sister court of appeals recently addressed a similar argument when an appellant argued that Local Government Code section 133.102 was facially unconstitutional because "the uses specified in section 133.102(e) for the court costs collected under section 133.102(a)(1) include uses that are not properly characterized as 'costs of court' " and, therefore, that section "impermissibly requires the judicial branch to perform an executive function by collecting a tax." *Salinas,* 426 S.W.3d at 325; *see*

*also O'Bannon v. State,* 435 S.W.3d 378, 381–82 (Tex.App.–Houston [14th Dist.] 2014, no pet.) (analyzing similar complaint).

In both *Salinas* and *O'Bannon,* the Fourteenth Court of Appeals held that the appellant failed to satisfy his burden to show that the statute was facially invalid because he had not shown that the funds would not be used for criminal justice activities once they were distributed. *See O'Bannon,* 435 S.W.3d at 382; *Salinas,* 426 S.W.3d at 327. Here, appellant argues that he need not provide evidence regarding how the "crime stoppers assistance" fee is distributed because the Code of Criminal Procedure provides that those funds are to be distributed to "the Criminal Justice Division of the Governor's Office," which "may use 10 percent of the funds for the operation of the toll-free [crime stoppers] telephone service" and "shall distribute the remainder of the funds only to crime stoppers organizations." *See* Tex.Code Crim. Proc. Ann. art. 102.013(a). He contends that these are not judicial branch activities, but executive branch activities that are administered by the executive branch of the State government.

*19 A review of the statutes related to crime stoppers organizations, however, reveals that funds collected for the "crime stoppers assistance" fund are sufficiently related to the collection of evidence in criminal cases to constitute legitimate criminal justice activities. *See O'Bannon,* 435 S.W.3d at 382 (addressing similar argument regarding collection of DNA testing fee). "Crime stoppers organizations" include either private or public organizations that pay "rewards to persons who report to the organization information about criminal activity and that forward[ ] the information to the appropriate law enforcement agency." Tex. Gov't Code Ann. § 414.001(2). The "Texas Crime Stoppers Council" has numerous duties, including the duties to "encourage, advise, and assist in the creation of crime stoppers organizations," to "foster the detection of crime and encourage persons to report information about criminal acts," to "promote the process of crime stoppers organizations to forward information about criminal acts to the appropriate law enforcement agencies," to "help law enforcement agencies detect and combat crime by increasing the flow of information to and between law enforcement agencies," and to "encourage, advise, and assist crime stoppers organizations in

implementing" specialized programs targeting sex offenders, among other duties. *Id.* § 414.005.

Thus, this statutory scheme allocates resources to be expended for legitimate criminal justice purposes. *See O'Bannon,* 435 S.W.3d at 382 (holding that "interconnected provisions" permitted DNA Testing Fee to be redistributed through state highway fund to Department of Public Safety "for legitimate criminal justice purposes"); *cf. Ex parte Lo,* 424 S.W.3d at 28 (holding that separation-of-powers provision may be violated "when one branch of government assumes or is delegated a power 'more properly attached' to another branch" or "when one branch unduly interferes with another branch so that the other branch cannot effectively exercise its constitutionally assigned powers."). Accordingly, appellant has failed to satisfy his burden to show that the statute is facially invalid. *See Rosseau,* 396 S.W.3d at 557.

We overrule appellant's fourth issue.

## Conclusion

We affirm the judgment of the trial court.

**All Citations**

--- S.W.3d ----, 2015 WL 2235122

Footnotes

1   *See* Tex. Penal Code Ann. § 19.02 (Vernon 2011).

2   The jury charge did not define "wrong." The jury charge contained, in relevant part, an instruction that the jury could find appellant not guilty by reason of insanity if it found by a preponderance of the evidence that, "as a result of severe mental disease or defect, [he] did not know that his conduct was wrong."

3   Effective April 1, 2015, the Texas Supreme Court adopted amendments to the rules of evidence. 78 Tex. B.J. 42, 42 (Tex.2015). The revisions to Rule of Evidence 503 were stylistic and do not affect the substance of the rule. We cite the old rule, as that version as in effect at the time this case was tried.

WestlawNext    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

-41-

4    Effective April 1, 2015, Rule 511 was revised to conform with Federal Rule of Evidence 502. 78 Tex. B.J. at 42. Rule of Evidence 511(a)(1) now provides: "A person upon whom these rules confer a privilege against disclosure waives the privilege if ... the person or a predecessor of the person while holder of the privilege voluntarily discloses or consents to disclosure of any significant part of the privileged matter unless such disclosure is itself privileged [.]" Tex.R. Evid. 511(a)(1). Again, we cite the prior version of the rule, which was in effect at the time this case was tried.

    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

    © 2015 Thomson Reuters. No claim to original U.S. Government Works.