Opinion issued December 21, 2023



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-22-00487-CR

_____

**CASSIUS COLLINS, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

On Appeal from the 337th District Court
Harris County, Texas
Trial Court Case No. 1598532

## MEMORANDUM OPINION

A jury convicted appellant Cassius Collins of the first-degree felony offense of burglary of a habitation with intent to commit aggravated assault. *See* TEX. PENAL CODE § 30.02(a)(3), (d). Collins argued the affirmative defense of insanity, but the jury rejected the defense. *See id.* § 8.01(a). The trial court sentenced Collins to

twenty years' imprisonment. *See id.* § 12.32(a). In a single issue on appeal, Collins challenges the factual sufficiency of the evidence supporting the jury's rejection of his insanity defense.[1] We affirm.

## Background

In the early morning of July 18, 2018, the complainant Angela Lara was home alone with her twelve-year-old daughter, the youngest of Lara's two daughters. Lara was lying awake in her first-floor bedroom, and her daughter was asleep in a bedroom upstairs. Lara heard her dog begin barking, so she got up to check on him. As she walked from her bedroom into the living room, Lara saw "a tall, slim person who had a hoodie on"—later determined to be Collins—approaching her. Lara did not recognize the intruder in the dark house. She yelled to her daughter to call 911, hoping to scare the intruder away.

Lara backed away from Collins into her bedroom when Collins attacked her. He hit her several times before she felt blood running down her shoulder and realized she was being stabbed. Collins also bit off part of Lara's right ear. Lara fought back,

---

[1]    Collins mentions both factual and legal insufficiency in the "Issue Presented" section of his appellate brief, but he argues only that the evidence was factually insufficient to support the jury's rejection of the insanity defense. Moreover, Collins requests that this Court reverse and remand for a new trial, which Collins acknowledges is the remedy in a criminal case for reversal based on factual insufficiency of the evidence. *See Matlock v. State*, 392 S.W.3d 662, 672 (Tex. Crim. App. 2013). Therefore, we construe Collins' appellate brief as challenging only the factual sufficiency of the evidence.

knocking a tooth out of Collins' mouth. Lara eventually yelled again for her daughter to call the police, provoking Collins to flee. Lara went upstairs to her daughter's bedroom and awoke her, and her daughter called 911. Lara was taken to the hospital where she was treated for severe injuries, including at least twelve stab wounds and collapsed lungs. Doctors were unable to reattach her ear. But Lara survived.

La Porte Police Department Sergeant Matt Davidson was immediately assigned to investigate the offense. Davidson met Lara at the hospital within hours of the offense. Lara initially suspected that the attacker was an ex-boyfriend of her older daughter, but this person was quickly cleared as a suspect. Davidson next went to Lara's house and found what he described as "a very horrific scene of a very vicious and brutal attack." In Lara's bedroom, where most of the assault occurred, police found a lot of blood, part of Lara's ear, and the tooth Lara had unknowingly knocked out of Collins' mouth. There were no signs of forced entry, but the back door had a doggy door in it, and there was blood on the door. Police recovered a video recording from a surveillance camera on a neighboring house showing a person dressed in dark clothing and a hoodie walking past the yard. The trial court admitted this video recording and photographs of Lara's house and Lara's and Collins' injuries.

Upon finding the tooth, Davidson called Lara at the hospital and asked whether she was missing a tooth. She was not. Lara told Davidson that she thought

3

Collins might be the attacker. Collins and Lara's oldest daughter have a child, who is Lara's granddaughter.[2]

Police found Collins nearby on the same day as the offense. Collins had been staying with James Godfrey and his family, who lived near Lara. When Davidson met Collins at the Godfreys' house, Davidson saw fresh wounds on Collins' left bicep. Collins was also missing a tooth, and the gap was "actively bleeding." Police arrested Collins. During a search of the Godfreys' house, police found blood smears and a smoking pipe on the sink of a bathroom used by Collins and the Godfreys' daughter.

Davidson testified that during the transport to jail, Collins admitted that he committed the offense because Lara let someone else hold Collins' daughter before Collins did. But Collins refused to say where he had hidden the knife used to stab Lara, saying it was enough that police had Collins himself. Collins made several odd statements that led Davidson to conclude that Collins had some sort of mental issue or was good at faking it. For example, Collins said he buried the knife as sacrifice to his spiritual growth. And when Davidson attempted to read the *Miranda* warnings, Collins asked whether they contained hidden text that would affect him in the next

---

[2]     The record is unclear why Lara suspected Collins. There was some evidence that Lara may have assisted her daughter in seeking child support from Collins. Lara's participation in the child support proceeding may have been introduced as a potential motive for the crime.

4

life. Davidson emphasized, however, that he believed Collins knew right from wrong.

A Harris County grand jury indicted Collins for the first-degree felony offense of burglary of a habitation with intent to commit aggravated assault. *See* TEX. PENAL CODE § 30.02(a)(3), (d). Collins was found competent to stand trial, and he filed a notice of intent to raise the insanity defense. *See id.* § 8.01(a) ("It is an affirmative defense to prosecution that, at the time of the conduct charged, the actor, as a result of severe mental disease or defect, did not know that his conduct was wrong.").

While awaiting trial, Collins was interviewed by two forensic psychologists, Dr. David Genac and Dr. Cassandra Hayes, each of whom provided expert witness testimony at trial for the State and the defense, respectively.[3] Collins told both experts that before the offense, he hallucinated that unknown males told him they planned to rape his daughter. He intended to go to Lara's house to kill the men and save his daughter. But he recalled a slightly different hallucination to each expert. He told his expert that he had been having similar hallucinations for nearly a month before the offense, but on the night of the offense, a voice said, "We're on our way over there to do this right now." He told the State's expert that he had one

---

[3]     Both experts' reports were also admitted at trial.

hallucination during which he heard Lara say that "your daughter is going to get raped this evening and I will make sure of it."

He described the offense itself differently to the experts as well. To his expert witness, Collins recalled that he wore a hoodie to Lara's house because he did not want to be recognized by the people whom he believed were harming his daughter, and he took a knife to protect her. When he arrived at Lara's house, he sat outside for some time "[t]rying to use all [his] deductive reasoning to see if they were inside the house" and looking for lights or movement inside the house. He entered Lara's house by reaching through the doggy door, unlocking the back door, and opening the door. Once Collins was inside, Lara's dog ran away from him, and then he saw Lara and she screamed. He did not recognize Lara, but he believed she intended to harm his daughter, so he ran at and attacked her. He remembered stabbing her and biting off her ear, and he remembered Lara kicking him and calling him "a devil." He remained quiet because he was scared and he knew it was wrong to enter her house without permission, but he believed he needed to do so to save his daughter from danger. After the assault, he ran out of Lara's house because he knew he had hurt someone, although he believed he hurt someone who was harming his daughter.

When he returned to the Godfreys' house, Collins showered off the blood. He knew he needed to mend the wound on his bicep, but he did not want to ask the

Godfreys for help because he did not want them knowing what he had done. When police arrived at the Godfreys' house, Collins knew why he was being arrested.

To the State's expert, however, Collins remembered significantly fewer details. For example, he denied wearing a hoodie, and the expert believed Collins was intentionally refusing to admit the information. Collins also told the State's expert that he blacked out during the walk to Lara's house and came to once he arrived back at the Godfreys' house. He denied having blood on him after the offense or even committing the crime, and he said that when he was arrested, he thought, "I hope I didn't do that." He also denied reporting to the police that his daughter was in any danger even though he believed at the time of the interview that his daughter was still in danger. He also said he knew that killing was wrong.

At trial, several lay witnesses testified about Collins' mental state. Collins' mother, Kristen Collins ("Kristen"),[4] testified that Collins began exhibiting odd behavior as a five- or six-year-old child when he was caught playing with his urine and feces.[5] His behavior progressively worsened throughout junior high and high

---

[4] Because Collins and his mother share the same last name, we refer to his mother by her first name to avoid confusion.

[5] Kristen also testified that when Collins was a year old, he fractured several bones, and she and her then-boyfriend were criminally charged over the incident. Collins was removed from Kristen's care until he was in elementary school. During her interview with the defense expert, Kristen reported that her then-boyfriend flung Collins against his crib out of frustration. Although Collins relies on this evidence

7

school, and Collins began receiving social security disability benefits in 2013, when he was seventeen years old. Kristen testified that 2013 and 2014 were particularly bad years for Collins' mental health, and Collins was admitted to several hospitals for inpatient psychiatric treatment over the years. Kristen testified that Collins was currently diagnosed with bipolar disorder, schizophrenia, and ADHD.[6] Kristen also testified that Collins had abused drugs.

In May 2018, two months before the July 2018 offense, Collins was admitted for psychiatric treatment after he told Kristen that people were trying to harm him telepathically. Kristen knew that Collins was not taking his psychiatric medication, and she perceived his statements as a mental health crisis. Kristen called 911, but she testified that Collins was not taken for psychiatric treatment because he denied he was suicidal.

The following day, Kristen called 911 again after Collins threatened to harm himself and Kristen. Collins was involuntarily committed for inpatient psychiatric treatment, but he was released ten days later and went to Kristen's house. Kristen returned Collins to the hospital because he did not appear stable and was talking to

---

on appeal, his own expert witness testified that this incident did not affect Collins' mental illness. This evidence is therefore not relevant to Collins' insanity defense.

[6] Collins' grandmothers testified at trial generally about Collins' odd behavior and mental illness, but they did not add anything to Kristen's testimony. Neither grandmother had seen Collins since at least May 2018.

8

himself. Kristen testified that the hospital refused to readmit Collins. Collins was released with a prescription for psychiatric medication, but Kristen was unable to fill it.

Kristen did not want Collins to live with her after his discharge because he had physically assaulted her previously. On one occasion, Kristen returned home from work one day and found Collins high on the couch with homemade drug paraphernalia next to him. She tried to remove the paraphernalia, but Collins swung and kicked at her. On two other occasions, Collins pushed and shoved her. Thus, when he was discharged in May 2018, Kristen found Collins a placement in a group home. Unbeknownst to Kristen, however, Collins eventually left the group home and moved in with the Godfreys. Kristen did not see Collins again until after the July 2018 offense.

The trial court admitted Collins' medical records from the May 2018 hospitalization. The records stated that Collins was aggressive towards his mother and threatened to fight her, and he had been off his medication since his previous hospitalization in November 2017. Kristen completed an application for emergency detention, stating that Collins "threatened [Kristen] and others to fuck me/them up [and] threatened to kill himself." Collins was discharged after eleven days because he completed treatment. He was diagnosed with schizophrenia and cannabis use disorder, and he was prescribed two medications.

Godfrey testified that Collins was staying at the Godfreys' house in La Porte at the time of the offense. A few hours before the offense, Godfrey took his daughter and Collins bowling, and they returned home about 11:00 p.m. Collins did not interrupt the bowling games. Collins reported that he and Godfrey also played video games that night. At some point, Collins left the Godfreys' house in dark clothing and a hoodie. He returned between 2:30 a.m. and 4:00 a.m. wearing only shorts and socks. Collins said nothing to Godfrey and went straight into the bathroom to shower. Godfrey denied leaving the blood stain or the pipe that police found on the bathroom sink when searching Godfrey's house after Collins' arrest.

Both parties also called expert forensic psychologists to testify at trial on the insanity issue. Dr. Hayes testified for the defense that she reviewed Collins' medical records from psychiatric hospitalizations in November 2017 and May 2018—the two most recent hospitalizations prior to the July 2018 offense—as well as jail medical records after Collins' arrest. Hayes also interviewed Collins and Kristen. Hayes testified that prior to the offense, Collins was diagnosed in November 2017 and May 2018 with schizoaffective disorder,[7] bipolar disorder, and polysubstance use or

---

[7] Hayes testified that symptoms of schizophrenia include hallucinations and delusions, and schizoaffective disorder is a combination of schizophrenia and mood disorder symptoms.

dependence. Hayes ultimately opined that Collins was legally insane at the time of the offense.

Hayes testified that she believed Collins had a severe mental illness at the time of the offense based on his reported hallucinations prior to the offense and his odd statements to police after his arrest. Hayes did not believe Collins intended to harm Lara; rather, he intended to prevent a crime against his daughter. Hayes also testified that Collins did not know his conduct was wrong. In her report, however, Hayes stated that Collins "acknowledged knowing the wrongfulness of entering the residence without permission at the time of the offense, but he believed he needed to do so in order to protect his daughter from harm based on the hallucinations and delusions he was experiencing." Hayes also testified that Collins ran out of Lara's house after the offense because he knew he had hurt Lara, and Collins knew why he was being arrested when police arrived at the Godfreys' house.

Hayes denied that Collins was intoxicated at the time of the offense because Collins denied it and he was not tested for drugs after his arrest. Hayes acknowledged that Collins had a history of abusing illicit substances, specifically synthetic marijuana and methamphetamine, and that using these drugs can cause hallucinations, delusions, and paranoia. Hayes testified that Collins said he had not used synthetic marijuana since 2015, but Collins reported using two fifteen-gram bags per day when he did use it. Collins told Hayes that when he smoked synthetic

11

marijuana, he experienced hallucinations as little black speckles in his field of vision. Collins described the hallucinations he had of his daughter's danger before the offense as "a bunch of black and blue floating around like electricity."

Dr. Genac, who testified as the State's expert forensic psychologist, ultimately concluded that Collins was sane at the time of the offense, that he knew right from wrong, and that he acted under the influence of synthetic marijuana rather than a mental disease or defect.

Genac disagreed with Hayes that Collins exhibited symptoms of schizophrenia at the time of the offense. Genac testified that a person must have schizophrenic symptoms for at least six months, but Genac was not provided with Collins' medical records covering all six months prior to the offense. Genac also testified that Collins' behavior before and after the offense was inconsistent with his self-reported hallucinatory symptoms. Genac testified that Collins seemed fine when he played video games and went bowling with the Godfreys hours before the offense. And Collins did not exhibit any bizarre behavior or altered mental status when he was initially booked into jail, although he told a psychiatrist later that day that he had experienced hallucinations and suicidal ideation.

Moreover, during Genac's interview with Collins, Collins claimed that he blacked out and could not remember any incriminating details of the offense, even though he could recall some incriminating details during the interview with Hayes.

12

Genac testified that it was unusual for schizophrenia to cause a person to be unable to recall only parts of an event; the person either remembers the event or does not remember it because the person was "in such a weird state of mind."

Genac also believed that Collins may have faked his symptoms. Collins told Genac that Kristen had previously coached Collins to say he was suicidal to gain admission to a psychiatric facility and to say he was no longer suicidal to be discharged. Genac testified that the medical records revealed that nearly all of Collins' admissions to psychiatric hospitals were due to reported suicidal ideation, hallucinations, and bizarre behavior. The trial court admitted recordings of two jail phone calls between Collins and Kristen, and Genac testified that Kristen was coaching Collins in the phone calls by telling him to report his hallucinations and his belief that he could telepathically communicate with people.

Genac also believed that Collins understood right from wrong. Collins wore a hoodie to Lara's house so he could hide his identity from the unknown men he was seeking out. Collins also entered Lara's house quietly through the doggy door to avoid detection rather than asking about his daughter. And Collins did not report to police that his daughter was in any danger. Collins also told Genac during their interview that he went to Lara's house to kill the people trying to harm his daughter. Collins knew that killing someone, even if the person was harming his daughter, was wrong and he could be sentenced to prison, but he took the risk anyway.

13

Finally, Genac testified that Collins' reluctance to provide details of the offense to Genac that Collins had provided to Hayes indicated that Collins experienced a drug-induced psychosis from either alcohol or cannabis. Collins told Genac both that he had not used marijuana in several years and that he used it around the time of his arrest to read people's minds. Genac also testified that jail records showed Collins reported using marijuana and alcohol on the day of the offense. Genac testified that Collins' mental illness symptoms arose around the same time he began using synthetic marijuana. Finally, Genac testified that Collins had a pattern of using "synthetic cannabis which triggered him into anger, causing [him] to assault others," including Kristen.[8]

The jury charge in the guilt-innocence phase of trial included instructions on the insanity defense. The charge also instructed the jury that voluntary intoxication is not a defense to the commission of a crime. The jury rejected Collins' insanity defense and found him guilty of the first-degree felony offense of burglary of a habitation with intent to commit aggravated assault. At Collins' election, the trial court sentenced Collins to twenty years' imprisonment. This appeal followed.

---

[8] In his expert report, Genac stated that Collins was arrested at age seventeen for injuring a child under fifteen, and Collins told Genac that "on that day he had smoked synthetic cannabis with a friend and that he attacked the complainant secondary to being angry at the complainant for using an emasculating slur towards him."

14

**Affirmative Defense of Insanity**

In his sole issue, Collins challenges the factual sufficiency of the jury's rejection of his insanity defense. He does not challenge the sufficiency of the evidence supporting the jury's finding of the essential elements of the offense.

## A.     Governing Law and Standard of Review

Texas law presumes that an accused is sane and intends the natural consequences of his actions. *Ruffin v. State*, 270 S.W.3d 586, 591 (Tex. Crim. App. 2008). Insanity is an affirmative defense, and the defendant bears the burden to prove the issue by a preponderance of the evidence. TEX. PENAL CODE §§ 2.04(d), 8.01(a); TEX. CODE CRIM. PROC. art. 46C.153(a)(2); *Ruffin*, 270 S.W.3d at 591–92. A finding of insanity excuses the defendant from criminal responsibility even if the State proves all elements of the offense, including mens rea, beyond a reasonable doubt. *Ruffin*, 270 S.W.3d at 592; TEX. CODE CRIM. PROC. art. 46C.153(a).

Texas law defines insanity as (1) "a severe mental disease or defect" that (2) resulted in the actor not knowing that his conduct was wrong at the time of the offense. TEX. PENAL CODE § 8.01(a). Under this definition, proof of a mental disease or defect alone is insufficient to establish the affirmative defense. *Id.*; *see Graham v. State*, 566 S.W.2d 941, 953 (Tex. Crim. App. 1978) ("The 'mental disease or defect' component is one that limits the availability of the defense [of insanity], not

15

one that automatically invokes its protective shield."); *McAfee v. State*, 467 S.W.3d 622, 636 (Tex. App.—Houston [1st Dist.] 2015, pet. ref'd).

The affirmative defense of insanity is a legal issue, not a medical one, and "the jury is not restricted to medical science theories of causation." *Graham*, 566 S.W.2d at 952–53; *see Petetan v. State*, 622 S.W.3d 321, 360 (Tex. Crim. App. 2021) (stating that insanity defense "is ultimately for the factfinder, not the expert"). The insanity defense "intertwin[es] moral, legal, and medical judgments." *Graham*, 566 S.W.2d at 950 (quotation omitted). In making its determination, the jury must consider "the inarticulable ethical component, which includes imperatives of free will, self control, and responsibility for one's acts" that are fundamental to criminal responsibility. *See id.* at 953; *see also Bigby v. State*, 892 S.W.2d 864, 878 (Tex. Crim. App. 1994) (stating that "only the jury can join the non-medical components that must be considered in deciding the ultimate issue" of sanity because "[o]therwise the issue of sanity would be decided in the hospitals and not the courtrooms").

"Although jurors may not arbitrarily disregard expert testimony as to insanity, neither may they give conclusive effect to such testimony." *McAfee*, 467 S.W.3d at 636–37; *see Graham*, 566 S.W.2d at 951 ("Opinion testimony does not establish material facts as a matter of law."). The jury may accept or reject in whole or in part

16

the opinion testimony of a physician, and the jury may accept lay testimony over expert testimony. *Graham*, 566 S.W.2d at 950–51.

The focus of an insanity defense is on whether the accused understood the nature of his action and whether he knew he should not do it. *Ruffin*, 270 S.W.3d at 592 n.17; *Bigby*, 892 S.W.2d at 878; *McAfee*, 467 S.W.3d at 636. In the context of the insanity defense, "wrong" means illegal. *Ruffin*, 270 S.W.3d at 592; *McAfee*, 467 S.W.3d at 636. "If the accused knows that his conduct is 'illegal' by societal standards, then he understands that his conduct is wrong, even if, due to a mental disease or defect, he thinks his conduct is morally justified." *McAfee*, 467 S.W.3d at 636; *see Ruffin*, 270 S.W.3d at 592. The circumstances of the crime itself—including attempts to conceal incriminating evidence or elude detection by law enforcement—can indicate knowledge of wrongful conduct. *Graham*, 566 S.W.2d at 951; *McAfee*, 467 S.W.3d at 637; *Torres v. State*, 976 S.W.2d 345, 347–48 (Tex. App.—Corpus Christi–Edinburg 1998, no pet.) (holding that, in determining insanity issue, jury may consider circumstantial evidence, including defendant's demeanor before and after committing crime, defendant's attempts to evade police or conceal incriminating evidence, defendant's expressions of regret or fear of consequences of actions, other possible motives for offense, and any other possible explanations for defendant's behavior). Rarely will we overturn a jury's findings concerning the insanity defense. *Graham*, 566 S.W.2d at 953.

Finally, the insanity defense is not available when the defendant was voluntarily intoxicated or temporarily insane due to intoxication. TEX. PENAL CODE § 8.04(a); *Afzal v. State*, 559 S.W.3d 204, 208 n.4, 214–15 (Tex. App.—Texarkana 2018, pet. ref'd); *Villanueva v. State*, No. 01-20-00303-CR, 2021 WL 2832974, at *11 (Tex. App.—Houston [1st Dist.] July 8, 2021, no pet.) (mem. op., not designated for publication). "Intoxication" in section 8.04(a) refers to the "disturbance of mental or physical capacity resulting from the introduction of any substance into the body." TEX. PENAL CODE § 8.04(d). Thus, "if a person experiences temporary visual and auditory hallucinations, paranoia, and other psychotic symptoms because they are under the influence of drugs and commits a crime in that delusional state, the affirmative defense of insanity is not available to obtain a not-guilty verdict—it is only relevant to punishment for the crime." *Villanueva*, 2021 WL 2832974, at *11.

Collins challenges the factual sufficiency of the evidence to support the jury's rejection of his affirmative defense. *See Matlock v. State*, 392 S.W.3d 662, 671 (Tex. Crim. App. 2013) (applying civil standard of factual-sufficiency review for challenges to rejection of affirmative defense in criminal proceeding because burden of proof is "preponderance of the evidence," which is same burden applied in civil cases). By challenging the factual sufficiency of the evidence to support an adverse finding, Collins is asserting that the adverse finding on his affirmative defense was so against the great weight and preponderance of the entire body of admitted

18

evidence as to be manifestly unjust. *Id.* at 670 n.29, 671; *McAfee*, 467 S.W.3d at 636.

In conducting a factual-sufficiency review, we view the entirety of the evidence in a neutral light while preserving the factfinder's weight and credibility determinations. *Matlock*, 392 S.W.3d at 671; *McAfee*, 467 S.W.3d at 636. We may find the evidence factually insufficient only if, "after setting out the relevant evidence and explaining precisely how the contrary evidence greatly outweighs the evidence supporting the verdict, [we] clearly state[] why the verdict is so much against the great weight of the evidence as to be manifestly unjust, conscience-shocking, or clearly biased." *McAfee*, 467 S.W.3d at 636 (quoting *Matlock*, 392 S.W.3d at 671); *see Reyna v. State*, 116 S.W.3d 362, 367 (Tex. App.—El Paso 2003, no pet.) ("The issue of insanity at the time of the offense lies within the province of the jury, and we will overturn its decision only where insanity is undisputed or resolved to one end of the spectrum outside the realm of discretion."). If we so conclude, we may reverse the trial court's judgment and remand for a new trial. *Matlock*, 392 S.W.3d at 672; *McAfee*, 467 S.W.3d at 636.

## B. Analysis

Viewing the evidence in a neutral light while preserving the jury's credibility determinations, we hold that the jury's rejection of Collins' insanity defense was not

so against the great weight of the evidence as to be manifestly unjust. *See Matlock*, 392 S.W.3d at 671; *McAfee*, 467 S.W.3d at 636.

As stated above, the affirmative defense of insanity focuses on whether the accused understood the nature of his action and whether he knew he should not do it. *See Ruffin*, 270 S.W.3d at 592 n.17; *Bigby*, 892 S.W.2d at 878; *McAfee*, 467 S.W.3d at 636. On appeal, however, Collins focuses on the "severe mental disease or defect" component of insanity but provides little analysis of whether the evidence established that he did not know his conduct was wrong. *See* TEX. PENAL CODE § 8.01(a).

There is substantial evidence that Collins suffered from a severe mental disease or defect before committing the offense. Medical records and witness testimony showed that Collins had been diagnosed with schizophrenia and bipolar disorder, and he had experienced sporadic hallucinations and delusions as symptoms of these illnesses. He also received social security disability benefits. In May 2018, two months before the incident, Collins was involuntarily committed for psychiatric treatment after hallucinating that people were trying to telepathically harm him. Collins had not regularly taken his prescribed psychiatric medication since his discharge from the hospital in May 2018, and Kristen testified that Collins' symptoms worsened when he did not take his medication. Nevertheless, a diagnosis of a serious mental illness alone is insufficient to meet the standard for legal insanity

20

under the Penal Code. *See Graham*, 566 S.W.2d at 953 ("The 'mental disease or defect' component is one that limits the availability of the defense, not one that automatically invokes its protective shield."); *see also Clark v. Arizona*, 548 U.S. 735, 773–76 (2006) (stating that diagnosis of serious mental illness does not necessarily answer question of whether defendant had "cognitive, moral, volitional, or other capacity" for "conventional guilt and criminal responsibility").

The evidence of Collins' mental state during the offense, however, is primarily limited to Collins' own statements that prior to the offense, he experienced a hallucination that his then-toddler daughter was in imminent danger of sexual assault, and he committed the offense to save his daughter. He also made odd statements to police after his arrest. Hayes, Collins' expert witness, testified that Collins was thus suffering from a severe mental disease or defect.

But the State's expert witness disagreed. Genac testified that except for the self-reported hallucination about his daughter and the odd statements to police after his arrest, Collins behaved normally just hours before the offense when he played video games and went bowling with the Godfreys. Genac also testified that there were no medical records showing that Collins exhibited symptoms for at least six months as required for a schizophrenia diagnosis. Genac believed Collins may have faked the hallucinations about his daughter because Collins admitted that his mother coached him on how to present with a mental illness. Genac was also suspicious that

21

Collins claimed not to remember any incriminating details of the offense when interviewed by Genac even though Collins could remember such details when interviewed by Hayes.

The jury was thus presented with substantial evidence that Collins had a severe mental disease or defect *before* he committed the offense, but the evidence of his state of mind during and shortly after the offense conflicted. Primarily, the jury was faced with two conflicting expert opinions concerning whether Collins suffered from a severe mental disease or defect at the time of the offense. The jury was free to reject the defense expert's opinion and accept the State expert's opinion that Collins did not have a severe mental disease or defect when he committed the offense. *See Graham*, 566 S.W.2d at 950–51. We cannot conclude that the evidence showing Collins did not have a severe mental disease or defect at the time of the offense was greatly outweighed by the contrary evidence. *See Matlock*, 392 S.W.3d at 672; *McAfee*, 467 S.W.3d at 636.

But even were we to assume that Collins suffered a severe mental disease or defect at the time of the offense, Collins offers no analysis on appeal showing that because of the severe mental disease or defect, he did not know his conduct was wrong. *See* TEX. PENAL CODE § 8.01(a). Quite the opposite, Collins' appellate brief concedes that he "was watchful of his surroundings before entering [Lara's] residence and *acknowledged knowing the wrongfulness of entering [Lara's]*

*residence without permission* at the time of the offense, but he believed he needed to do so to protect his daughter from harm." (Emphasis added.) Collins also acknowledged that he intended to kill the people he believed were harming his daughter and that killing a person is illegal and could result in incarceration, but he took the risk anyway.

Collins was charged with and convicted of burglary of a habitation with intent to commit aggravated assault, which requires entering, without the owner's effective consent, a habitation and committing or attempting to commit an aggravated assault. *See id.* § 30.02(a)(3); *see also id.* §§ 22.01(a) (assault), 22.02(a) (aggravated assault). Collins' statements and appellate arguments conclusively establish that he understood the nature of his conduct and that he should not do it because it was wrong. *See Ruffin*, 270 S.W.3d at 592 (stating that issue of insanity is whether "the defendant factually [knew] that society considers this conduct against the law, even though the defendant, due to his mental disease or defect, may think that the conduct is morally justified"); *Bigby*, 892 S.W.2d at 878; *McAfee*, 467 S.W.3d at 636. This supports the jury's rejection of Collins' insanity defense. *See* TEX. PENAL CODE § 8.01(a).

Other evidence also shows that Collins knew his conduct was wrong. For example, he wore a hoodie during the offense, admittedly because he did not want to be recognized. Once at Lara's house, Collins waited outside, observing the house

23

for any light or activity inside. He surreptitiously entered the house by reaching through a doggy door and unlocking the back door. He remained quiet while in Lara's house, instead of demanding to see his daughter. After Lara yelled a second time, Collins fled because, as he later stated, he was scared and knew he had entered the house without permission. These actions indicate that Collins attempted to commit the offense without being detected by Lara or law enforcement, and thus that he knew his conduct was illegal. *See Graham*, 566 S.W.2d at 951; *McAfee*, 467 S.W.3d at 637; *see also Dashield v. State*, 110 S.W.3d 111, 115 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd) (concluding that jury could infer defendant debated rectitude of assault and attempted to flee before police arrived, and thus knew right from wrong, where defendant approached store several times before entering, placed brick on counter, picked up brick as if to throw it at storekeeper, threw brick at storekeeper, and fled store).

Furthermore, after the offense, Collins hid the knife he used to stab Lara and discarded the hoodie that was likely covered in Lara's blood. He refused to tell police where the knife and hoodie were located. Collins also showered immediately upon his return to the Godfreys' house. He declined asking for help to mend a large wound on his bicep that he received during the offense, admittedly because he did not want the Godfreys to know about it. These actions indicate that Collins attempted to conceal incriminating evidence, and thus that he knew his conduct was illegal. *See*

24

*Graham*, 566 S.W.2d at 951; *McAfee*, 467 S.W.3d at 637; *see also Hines v. State*, 570 S.W.3d 297, 304 (Tex. App.—Houston [1st Dist.] 2018, no pet.) (concluding that defendant's measures to conceal murder, including moving body and hiding truck, supported finding that defendant knew conduct was illegal).

Finally, the jury was also presented with evidence that Collins' conduct was caused by his voluntary intoxication, which negates the insanity defense. *See* TEX. PENAL CODE § 8.04(a); *Villanueva*, 2021 WL 2832974, at *11. Genac testified that Collins had a history of engaging in violent, assaultive behavior toward family members when he ingested synthetic marijuana. Moreover, when police arrested Collins at the Godfreys' house, a pipe was sitting on a bathroom sink used by Collins and Godfrey's daughter. Collins' description of the hallucinations he experienced when he was high on synthetic marijuana—little black speckles—was similar to his description of the hallucination he experienced on the night of the offense: "a bunch of black and blue floating around like electricity." The jury could have believed Genac's testimony that Collins was voluntarily intoxicated at the time of the offense over Hayes' contrary testimony, and thus the jury properly could have rejected Collins' insanity defense. *See* TEX. PENAL CODE § 8.04(a); *Graham*, 566 S.W.2d at 950–51; *McAfee*, 467 S.W.3d at 636–37.

Collins has not established that the jury's rejection of his insanity defense was so against the great weight and preponderance of the entire body of admitted

25

evidence as to be manifestly unjust. *See Matlock*, 392 S.W.3d at 670 n.29, 671; *McAfee*, 467 S.W.3d at 636. We therefore hold that the evidence was factually sufficient to support the jury's rejection of the affirmative defense of insanity. We overrule Collins' sole issue.

## Conclusion

We affirm the trial court's judgment of conviction.


April L. Farris
Justice

Panel consists of Justices Kelly, Landau, and Farris.

Do not publish. TEX. R. APP. P. 47.2(b).